967 F.2d 588
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Mercedes MAHARIS, Plaintiff-Appellee,
v.
OMAHA VACCINE COMPANY, a Nebraska corporation, Defendant-Appellant.
 No. 90-56356.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted April 7, 1992.
Decided June 16, 1992.
 
 Before CANBY, REINHARDT and WIGGINS, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 OVERVIEW
 
 2
 This appeal stems from a contract and trade secrets dispute between Omaha Vaccine Company ("Omaha Vaccine") and Mercedes Maharis ("Maharis"). Omaha Vaccine appeals from a jury verdict in favor of Maharis in the amount of six hundred thousand dollars. Omaha Vaccine argues that the customer list in question was not a trade secret and was not the property of Maharis. Furthermore, Omaha Vaccine claims that there was no evidence to support the jury's award of $300,000 in compensatory damages and $300,000 in punitive damages. Lastly, Omaha Vaccine claims that the district court erred in permitting the jury to decide the question of punitive damages. The district court had diversity jurisdiction over this dispute under 28 U.S.C. § 1332 (1988). A timely notice of appeal was filed after the entry of judgment and this court has jurisdiction pursuant to 28 U.S.C. § 1291 (1988).
 
 BACKGROUND
 
 3
 Maharis was a producer of video films dealing with equestrian subjects. Her business was conducted under the name Mercedes Maharis Productions. In 1983, Maharis entered into the business of distributing other people's equestrian videos as well as her own. She began doing business under the trade name "Equestrian Video Library." The business distributed video tapes to wholesalers, retailers and directly to consumers. During its first three years of operation, the business generated over $185,000 in gross sales. During that time Maharis invested substantial time and money in developing a customer list containing the names and addresses of individuals and businesses who had purchased or expressed an interest in purchasing equestrian videos.
 
 
 4
 After Maharis had been in business for about a year, she was approached by Sally Lasater with a partnership proposal. Maharis declined the partnership proposal, but hired Lasater to assist with marketing. In 1985, Lasater, acting without authorization, had the customer list photocopied and then left the premises with the copies. Maharis learned of Lasater's actions and intercepted her at Los Angeles International Airport where Lasater was waiting to board a plane. Maharis retrieved the lists and fired Lasater.
 
 
 5
 Maharis and Omaha Vaccine first became acquainted at a trade show in 1985. In 1986, Omaha Vaccine entered into an exclusive personal license agreement with Maharis and also bought a three year option to purchase her business. The license agreement gave Omaha Vaccine the exclusive right to operate the Equestrian Video Library business for three years. Omaha Vaccine was required to make reasonable efforts to promote and develop the business. As part of the license agreement, Maharis turned over all the assets of her business including her confidential customer lists. Omaha agreed that at the end of the license agreement, it was to return all of the assets of the business including the enhanced customer list. Omaha also agreed that the license was to be personal and that it could not assign its interest in the license without Maharis' approval.
 
 
 6
 Omaha Vaccine ran the Equestrian Video Library for two years of the license agreement. During that time it expended considerable money and effort in expanding the customer list which it had received from Maharis. This included a $2700 promotion giveaway in order to attract potential customers.
 
 
 7
 In 1988, Omaha Vaccine created a new marketing entity known as the Discovery Trail. It transferred the assets of the Equestrian Video library which it was licensed to use to the new entity, including the customer list and the toll free telephone number. It informed the customers on the customer list that the Equestrian Video Library was the predecessor of the Discovery Trail. Customers were then told to order from the Discovery Trail.
 
 
 8
 Ultimately, Omaha Vaccine decided to get out of the video market. Thus, it entered into an agreement to sell the Discovery Trail to Sally Lasater. Lasater paid $100,000 for the business which included the customer list and the toll free telephone number which belonged to Maharis. Lasater was very successful in running the Discovery Trail. In its first two years of operation after the sale, the Discovery Trail grossed approximately $654,000.
 
 
 9
 Because of the sale of the Discovery Trail, Omaha was obviously unable at the end of the license agreement to return the assets which it was licensed to use. Maharis sued Omaha Vaccine for breach of contract and misappropriation of trade secrets. After a jury trial, Omaha Vaccine was found liable for misappropriation of Maharis' trade secrets and was ordered to pay compensatory damages in the amount of $300,000 and punitive damages in the amount of $300,000. Omaha Vaccine filed post-trial motions for new trial, JNOV and remittitur which the trial court denied. Omaha Vaccine now appeals.
 
 DISCUSSION
 
 10
 This case is an appeal from a denial of a JNOV motion following a jury verdict awarding Maharis both compensatory and punitive damages. Such appeals are reviewed under an extremely deferential standard. The reviewing court's role is the same as the district court's. The Jeanery Inc. v. Jim Jeans, Inc., 849 F.2d 1148, 1151 (9th Cir.1988). JNOV is only proper if "without accounting for the credibility of witnesses, [the court] finds that the evidence and its inferences, considered as a whole and viewed in the light most favorable to the nonmoving party, can support only one reasonable conclusion--that the moving party is entitled to judgment notwithstanding the adverse verdict." Id. (emphasis added). "Neither the trial judge nor [the appellate] court is permitted to weigh the evidence or substitute its judgment for that of the jury." Id. So long as the verdict is supported by any relevant evidence that reasonable minds might accept as adequate to support a conclusion, even if the evidence is susceptible to two inconsistent conclusions, the judgment of the jury must be upheld. See Landes Const. Co. v. Royal Bank of Canada, 833 F.2d 1365, 1370-71 (9th Cir.1987) (emphasis added). In determining whether such evidence exists, a court may not weigh the evidence nor assess the credibility of any witnesses. Transgo v. Ajac Transmission Parts Corp., 768 F.2d 1001, 1024 (9th Cir.1985), cert. denied, 474 U.S. 1059 (1986). The credibility of witnesses and the weight of the evidence are issues for the jury and are generally not subject to appellate review. Id. Where there is sufficient evidence before the jury on a particular issue and if the instructions of law were correct, the jury's verdict must stand. Id. at 1014 (emphasis added).
 
 
 11
 I. There is Evidence to Support the Jury's Finding that the Final Customer List was a Protectible Trade Secret Under California Law.
 
 
 12
 A. A Customer List may be a Protectible Trade Secret
 
 
 13
 Under California law, a trade secret is considered any information which derives economic value from not being known to the public or other persons who can obtain economic value from its use. In order to be considered a trade secret, however, such information must be the subject of reasonable efforts to ensure its confidentiality. A trade secret is "information ... that: derives independent economic value, ... from not being generally known to ... other persons who could obtain economic value from its ... use; and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Cal.Civ.Code § 3426.1(d)(1). A customer list, like the one at issue, may satisfy the elements of section 3426.1(d)(1) and thus, constitute a protectible trade secret under California law. Courtesy Temporary Service v. Camacho, 222 Cal.App.3d 1278, 1287 (1990); Greenly v. Cooper, 77 Cal.App.3d 383, 392 (1978).
 
 
 14
 B. There were Sufficient Facts to Support the Jury's Finding that Maharis' List was a Trade Secret
 
 
 15
 Omaha Vaccine contends that this court should review de novo the jury's finding that Maharis' customer list was a trade secret. This claim is without merit. The determination of whether information constitutes a trade secret is a factual question for the jury and is thus reviewed under the deferential standard outlined above. Moss, Adams & Co. v. Shilling, 179 Cal.App.3d 124, 128 (1986) ("whether information is a trade secret constitutes a question of fact"). Omaha Vaccine cites several cases for the proposition that a court may determine as a matter of law that information is or is not a trade secret. Determining an issue as a matter of law is not the same as reviewing a jury finding de novo. The cases which Omaha Vaccine cites are all cases in which it was clear based on the undisputed facts that the information was not a trade secret. See e.g., Scott v. Snelling & Snelling, 732 F.Supp. 1034, 1044 (N.D.Cal.1990) (court found that customer lists of former employees created by their own efforts and based on their personal knowledge and prior business contacts developed while working for former employer were not trade secrets of former employer); Moss, Adams & Co. v. Shilling, 179 Cal.App.3d 124 (1986) (court found that some names and addresses on a confidential customer list were not protected trade secrets where the defendants had personal knowledge of those names and addresses as they had performed services for those people). None of the cases cited by Omaha Vaccine was a case where an actual customer list was misappropriated. Each was a case where information which was on a customer list was also the personal knowledge of defendant. Such is not the case here. Lasater did not develop her customer list from her own personal knowledge. She purchased Maharis' list from Omaha Vaccine. Thus, the question of whether the customer list was a trade secret cannot be decided as a matter of law.
 
 
 16
 The standard under which this question must be decided is whether, taking the evidence in a light most favorable to Maharis, there is "any relevant evidence as reasonable minds might accept as adequate to support [the jury's] conclusion." Landes Const. Co. v. Royal Bank of Canada, 833 F.2d 1365, 1370-71 (9th Cir.1987). Here, it is clear that there is relevant evidence which would support the jury's verdict. The jury heard testimony about the substantial effort which Maharis and then Omaha Vaccine expended in an attempt to develop a substantial customer list. Omaha Vaccine's own witnesses testified that the company spent over twenty-five hundred dollars on the brass horsehead promotion in an attempt to expand the customer list.[1] The company also purchased other lists of potential customers in an attempt to expand the list. The record reveals that Omaha Vaccine expended considerable time and effort in developing a list of customers who were willing to purchase equestrian videos, thus clearly creating a more valuable list than the generic list of tack shops which were available commercially. Furthermore, even Maharis' original list identified people who had actually purchased her product. Thus, it too was a more valuable list than one which simply identified distributors of horse related products. There was clearly enough evidence presented to the jury to allow it to conclude that the customer list sold to Lasater did have sufficient independent economic value to constitute a trade secret.
 
 
 17
 Likewise, on the issue of reasonable secrecy efforts, there was sufficient evidence presented to the jury to support its conclusion that the lists were trade secrets. Maharis testified that Omaha Vaccine orally agreed to keep the list secret. Furthermore, the jury heard testimony that Omaha Vaccine treated the list as confidential and even forced its employees to sign a confidentiality agreement with respect to the list. This evidence is sufficient to support the jury's finding that reasonable efforts were taken to protect the secrecy of the customer list.
 
 
 18
 II. Omaha Vaccine did not have the Right to Sell the List to Lasater
 
 
 19
 Omaha Vaccine contends that as a matter of law it cannot be held liable for misappropriating its own customer list. Omaha Vaccine's argument is inapposite. The argument rests solely on the erroneous assumption that Omaha Vaccine was the sole owner of the customer list. In fact, the only interest in the customer lists which Omaha Vaccine owned was the limited interest granted to it by the license. That interest was the exclusive right to use the list for the three year license period, an interest which Omaha Vaccine was prohibited from assigning without Maharis' permission. The remaining interests in the customer lists were owned exclusively by Maharis. The customer lists were one of the assets of the business which Maharis licensed Omaha Vaccine to operate. Under the license agreement, Omaha Vaccine was to return the assets of the business at the conclusion of the license period. The jury heard testimony that under the license agreement one of the assets to be returned was the customer list, including whatever improvements or additions Omaha Vaccine had made to the list during the period of the license. Jim Renier, the President of Omaha Vaccine and the person who negotiated the license agreement, stated that he interpreted the agreement as obliging Omaha to return to Maharis customer information developed by it in its capacity as her licensee, and that he informed Maharis at the time the agreement was executed that in the event the option to purchase was not exercised she would get back the "expanded customer base." This testimony was corroborated by the testimony of Lee Myers, an Omaha employee and Maharis' own testimony. Taken in the light most favorable to Maharis, this evidence clearly supports the jury's finding that the list at issue was the final list sold to Lasater.
 
 
 20
 Once Maharis' right to the final list is established, it is clear that Omaha Vaccine misappropriated the list. Under section 3426.1(b) "disclosure or use of a trade secret of another without ... consent by a person who ... at the time of disclosure or use, knew or had reason to know that his or her knowledge was ... acquired under circumstances giving rise to a duty to maintain its secrecy" is a misappropriation of a trade secret. The jury had ample evidence to support its finding that Omaha Vaccine acquired the customer list under circumstances giving rise to a duty to maintain its secrecy. The jury heard evidence that Renier was concerned that the list not be disclosed to any third parties prior to it being given to Omaha Vaccine under the license agreement as that would reduce its value. It heard testimony that Renier knew that Maharis kept the list in a locked cabinet and did not allow it to be removed from her business premises. There was evidence that Renier agreed to protect the list's confidentiality and there was testimony that Omaha Vaccine required its employees who worked with the list to sign a confidentiality agreement. Thus, there is ample evidence to support the jury's finding that Omaha Vaccine had a duty to keep the list secret. Sale of the list to a third party clearly was a misappropriation of the list.
 
 
 21
 III. There was Evidence to Support the Jury's Award of $300,000 in Compensatory Damages.
 
 
 22
 Omaha Vaccine claims that Maharis should be denied recovery because there is no evidence to support the jury's award of compensatory damages. Much of Omaha Vaccine's argument is based on its assertion that the list at issue was not the final list sold to Lasater. Thus, those arguments may be easily dismissed. Omaha also claims that the customer list was worth at most $480, the cost involved in obtaining a list of all tack shops throughout the United States. Omaha Vaccine's reliance on this claim is disingenuous. While a complete list of all tack shops would be valuable, it is certainly not as valuable as a list which specifically identifies tack shops that have bought or expressed an interest in buying Maharis' videos. The California courts have expressly found that customer lists like Maharis' which exclude people not interested in the product have value from a negative viewpoint. "If a customer list is acquired by lengthy and expensive efforts, which, from a negative viewpoint, indicate those entities that have not subscribed to plaintiff's services, it deserves protection as a trade secret." Courtesy Temporary Serv. v. Camacho, 222 Cal.App.3d 1278, 1288 (1990). Individuals who acquire a list which has already screened out uninterested consumers and thereby saved "themselves comparable efforts in screening out those entities who declined [their] patronage, have acquired commercially invaluable information." Id.
 
 
 23
 Furthermore, the jury heard ample testimony by which it could conclude that the amount of damages was $300,000. An accountant, Robert Egan, testified that the value of the business which should have been returned to Maharis was between $410,000 and $750,000. The jury heard that the price at which Omaha Vaccine could purchase the business under the option agreement was $300,000. There was testimony that Sally Lasater grossed over $600,000 in the first two years of operating the business using Maharis' list. There was additional testimony that had Maharis operated the business she would have had a profit ratio of fifty percent. Clearly, taking the evidence in the light most favorable to Maharis, there is ample evidence to support the jury's finding that the compensatory damages were $300,000.
 
 
 24
 IV. There was Evidence to Support the Finding that Omaha Vaccine Acted Wilfully and Maliciously
 
 
 25
 Omaha Vaccine claims that there is no evidence to support an award of punitive damages as it did not act wilfully or maliciously. This argument has little merit. Omaha Vaccine intentionally sold the customer list which it enhanced as licensee of Maharis to a third party, in direct violation of the license agreement, instead of returning it along with the other assets of the business to Maharis. Omaha Vaccine knew that Maharis owned the reversionary interest in the enhanced customer list, as evidenced by the Renier testimony discussed above. In addition, Omaha had agreed to keep the customer lists secret, to not assign its interest in the lists without permission and to return the lists to Maharis. Instead, it sold the lists to Lasater. Finally, not only did Omaha Vaccine sell its remaining interest in the list in violation of the license agreement and sell Maharis' interests in the list too by purporting to transfer sole ownership of the list, but it knowingly sold it to a woman who had already attempted to misappropriate the list from Maharis when she was Maharis' employee. These facts clearly support a finding that Omaha Vaccine acted wilfully and maliciously.
 
 
 26
 V. Allowing the Jury to Suggest the Amount of Punitive Damages was a Harmless Error.
 
 
 27
 Lastly, Omaha Vaccine argues that the punitive damage award should be overturned because the jury was improperly allowed to decide the issue. Under California law, the issue of punitive damages in a trade secret case is an issue which is to be decided by the court. California Civ.Code § 3426.3(c). Here, the jury was instructed on punitive damages and allowed to award $300,000 in punitive damages.
 
 
 28
 First, it is somewhat disingenuous for Omaha Vaccine to complain that the jury was allowed to decide the question of punitive damages when it failed to object to the jury instruction. Instead, Omaha Vaccine waited until the jury resolved the issue against it before raising the objection. However, addressing the merits of the claim, Omaha Vaccine must show that this procedural error was prejudicial before it will constitute grounds for reversal. Glanzman v. Uniroyal, 692 F.2d 58, 61 (9th Cir.1989). Omaha Vaccine has failed to carry this burden. The trial judge specifically considered the award of punitive damages in the context of Omaha Vaccine's motions for new trial, JNOV and remittitur and affirmed the jury's award of $300,000 as reasonable and supported by the evidence. Therefore, the error was harmless.
 
 
 29
 The judgment of the district court is AFFIRMED.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 Omaha Vaccine asserts that the relevant customer list at issue in this case is the original list which Maharis turned over to Omaha Vaccine at the inception of the license agreement. This is not so. The enhanced customer list which Omaha Vaccine sold to Lasater is the list at issue. Under the license agreement Omaha Vaccine had a duty to make reasonable efforts to expand the original customer list and then to return the enhanced list to Maharis upon the termination of the license agreement. Omaha Vaccine acted on Maharis' behalf in developing and expanding the customer list. While Omaha Vaccine could not be prevented from utilizing the knowledge it gained in expanding the list, see Moss, Adams & Co., supra, it could not sell the list to a third party