# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 96-CA-00620-SCT

*FRED'S STORES OF MISSISSIPPI, INC. AND
FRED'S, INC.*

*v.*

*M & H DRUGS, INC.*

## CONSOLIDATED WITH

## NO. 96-CA-00633-SCT

*FRED'S STORES OF MISSISSIPPI, INC. AND
FRED'S, INC.*

*v.*

*M & H DRUGS, INC.*


| | |
|---|---|
| DATE OF JUDGMENT: | 5/20/96 |
| TRIAL JUDGE: | HON. R. KENNETH COLEMAN |
| COURT FROM WHICH APPEALED: | CIRCUIT COURT OF LAFAYETTE COUNTY |
| ATTORNEY FOR APPELLANTS: | JOHN H. DUNBAR |
| ATTORNEYS FOR APPELLEE: | GRADY TOLLISON, JR. |
| | AMY D. WHITTEN |
| NATURE OF THE CASE: | CIVIL - TORTS - OTHER THAN PERSONAL INJURY AND PROPERTY DAMAGE |
| DISPOSITION: | AFFIRMED IN PART; REVERSED AND RENDERED IN PART - 9/10/98 |
| MOTION FOR REHEARING FILED: | 9/23/98 |
| MANDATE ISSUED: | |


EN BANC.

**PITTMAN, PRESIDING JUSTICE, FOR THE COURT:**

¶1. M & H Drugs, Inc. (hereinafter "Super D"), the plaintiff in this case is the parent corporation of the Super D store in Oxford, Mississippi. Erik Broome (hereinafter "Broome") was the manager and a pharmacist at Super D. Part of Broome's job was to supervise the creation and maintenance of a master customer list known within the store as an I.R.S. list (hereinafter "I.R.S. list"). The creation of the I.R.S. list was a service provided by Super D to its customers. Super D routinely printed the I.R.S. list on December 31 of each year. Primarily, the list was used around tax time each year when customers would inquire as to their total expenditures on prescription medication for the year. The list contained the patient's last name, first name, phone number, street address, city, state, zipcode, number of prescriptions filled that year, and a dollar amount of the money spent at Super D on prescriptions for the year. There was no policy or procedure for keeping the list after it was no longer needed, or the information became outdated. One pharmacist, Terry Klepzig testified that when the information became outdated or the list was no longer needed for the tax year, he would throw the list away in the dumpster. The list was kept in the pharmacy area in a filing cabinet when it was not being used. At times of the year when the list was used frequently, it was kept in an accordion folder on the pharmacy counter near the cash register. The pharmacy of the Super D was located in the back left corner of the building. There was a gate without a locking device at the entrance of the pharmacy platform. Access to the pharmacy was limited to pharmacists, pharmacy technicians, pharmacy students in internships, stock persons, and when absolutely necessary a counter person.

¶2. In the summer of 1991, Fred's Stores of Mississippi, Inc. (hereinafter "Fred's") was involved in opening a store in Oxford. In late May of 1991, Broome was contacted by Leland McDivitt, a representative of Fred's, concerning becoming the manager for the new Fred's pharmacy. Broome and McDivitt had a face to face meeting concerning employment with Fred's on May 29, 1991. On May 30, 1991, Broome accepted Fred's offer of employment. On June 6, 1991, Broome gave notice to Super D that he would be leaving and going to work for Fred's. Broome continued to work for Super D throughout the month of June, but was assigned to stores other than the Oxford store. On June 24, 1991, Broome returned to the Oxford store to retrieve some personal belongings. At that time, he also picked up the I.R.S. list from the counter and took it. Broome planned to send a letter to some of his customers letting them know that he would now be working at Fred's. He planned to do this mailing out of his own pocket. Broome did not think his taking of the list would be any "big deal" because it was after April 15 and the list was not used very often after that date.

¶3. Broome started work for Fred's on July 2, 1991. Broome had two or three conversations with McDivitt between June 6, 1991 and until July 1, 1991. On July 8, 1991, Broome had a telephone conversation with McDivitt. McDivitt wanted to set up a meeting between Broome and Mr. Casey, who was vice president of pharmacy operations at Fred's. McDivitt also asked Broome if he had any former customers that he would like to contact, and if so to bring that to Casey's attention. On July 11, 1991, Broome went to Memphis to Fred's headquarters to meet with Casey. At that meeting, Casey asked Broome if he had a list of the customers that he wanted to contact. Broome had the I.R.S. list with him in a manila envelope. Casey asked Broome to draft a letter to the physicians in Oxford and one to his customers announcing his new position with Fred's and explaining benefits of shopping at Fred's. Casey showed Broome some sample letters. When Broome was done drafting his letters, Casey asked if Broome would leave the list and a sample of his signature at headquarters so

that Fred's could mail out the letters. Broome understood that no letters would be mailed out bearing his signature without his approval. Broome had highlighted 100-120 names on the list to which he intended to mail letters. Using the list that Broome had provided, Fred's subsequently mailed out letters to 954 customers. Casey testified that Fred's used two criteria to determine to whom to send the letters. The criteria were that the customer had an Oxford zipcode and that the customer had spent over $100 during the year on prescription drugs at Super D. However, Casey admitted at trial that the criteria were not followed and therefore, it was possible that more than 954 letters were mailed. Bruce Greer, whose responsibility it was to record the number of letters mailed from Fred's each day, testified that on July 24, 1991 (the day the letter from Broome was mailed), 1242 letters were mailed from Fred's.

¶4. Around July 15, 1991, two weeks after Broome went to work for Fred's and a week after he had delivered the customer list for use in Fred's mailing, supervisors at Super D realized the list was missing. Either Terry Klepzig or Charles Strong with Super D called Broome and asked if he had accidentally taken the list. Broome said that he had not taken the list. At trial, he explained that his answer was truthful because he had not accidentally taken the list, but instead had taken it on purpose. Broome testified that he told Casey about the inquiry from Fred's and Casey told Broome not to worry about it. Casey testified that he and Broome never had a conversation about the inquiry. He testified that he returned the list to Broome on July 18, 1991 when he was in Oxford. Casey testified that the next time he saw the list was on opening day at the new Fred's, which was July 26, 1991. Casey said that Broome told him that he had had an inquiry from Super D concerning the list that day, and that he wanted Casey to take the list back to Memphis so that he could honestly say he did not have the list. Casey testified that at that point he had "deep concern" about whether the list belonged to Broome. Casey put the list in his brief case and returned to Memphis. Upon arriving at Fred's headquarters in Memphis, Casey met with his supervisor, Gary Hendron. Casey told Hendron what Broome had related to him, and Hendron instructed Casey to "shred the list". On Monday morning, July 29, 1991, Casey checked the data base created for the mailing. He found that it had been erased.

## STATEMENT OF THE CASE

¶5. M & H Drugs, Inc. filed a lawsuit against Fred's of Mississippi, Inc. on August 19, 1991. M & H Drugs later dismissed Broome without prejudice. M & H Drugs also joined Fred's, Inc.

¶6. Trial was set for October, 1993. However, the parties entered into discussions for Fred's acquisition of the Super D drugstores. Settlement talks were unsuccessful and trial was reset for May 13, 1996. Following a jury trial, a Lafayette County Circuit Court Jury found for Super D and awarded actual compensatory damages of $56,750. Following the punitive phase, exemplary damages of $300,000 were awarded as well. Final judgment was entered and attorneys' fees and expenses were awarded in the amount of $72,042.48. Interest on the compensatory award was set at 8% from October 26, 1992. Eight percent interest was also applied to the award of attorneys' fees and expenses.

¶7. This case comes to the Court as a consolidated case with Cause No. 96-CA-00633. However, the two appeals arise from the trial of one lawsuit. Final judgment was entered in this case on May 20, 1996. Fred's filed a Notice of Appeal on June 11, 1996 stating four grounds for appeal. Thereafter,

on June 17, 1996, the trial court ruled on Fred's post-trial motions. Fred's then filed a second Notice of Appeal stating the same grounds for appeal and adding to those grounds the denial of all post trial motions.

¶8. Fred's appeals from the trial court and assigns the following as error:

**I. THIS COURT SHOULD REVERSE AND RENDER JUDGMENT FOR THE DEFENSE ON ALL CLAIMS BECAUSE THE PLAINTIFF'S PROOF WAS INSUFFICIENT.**

**A. The plaintiff alleged the defendants induced Mr. Erik Broome, a former pharmacist of the Super D in Oxford, to steal a list of names and addresses of Super D customers, which list the plaintiff alleged was a trade secret. All of the plaintiff's claims were preempted by the Uniform Trade Secrets Act, § 75-26-1, *et seq,* Miss. Code Ann. (1972).**

**B. As a matter of law, the plaintiff failed to prove the list was a trade secret.**

**C. Mr. Broome testified at trial that he took the list on his own, without any involvement of the defendants. The lower court should have granted the defense motions for judgment as a matter of law, that the defendants did not induce Mr. Broome to take the list.**

**D. No customer on the list testified he shopped at Fred's instead of Super D because he received such a letter. The plaintiff's proof of proximate cause was insufficient.**

**E. The plaintiff's proof of damages was insufficient. Among other things, the plaintiff did not prove loss of net profits.**

**II. THE CASE SHOULD BE REMANDED FOR NEW TRIAL ON COMPENSATORY AND PUNITIVE DAMAGES, EVEN IF THE COURT HOLDS PLAINTIFF'S EVIDENCE WAS SUFFICIENT.**

**A. The lower court allowed the plaintiff to withhold the most important piece of evidence in the trial from discovery, under claim of confidentiality. The lower court then admitted the evidence and allowed the plaintiff to publish the evidence to the jury, in effect waiving the claim of confidentiality. Was this "trial by ambush" proper?**

**B. The lower court allowed the plaintiff to prove statements made by the defendants during settlement discussions. The statements were not made to plaintiff at any other time or circumstance. Did these rulings violate MRE 408 and require a new trial?**

**C. Was it reversible error to instruct the jury by repeated abstract statements of law, which failed to instruct the jury correctly?**

**D. Regardless of the measure of damages, is the corporation required to prove its damages by the best evidence? Does the best evidence include the corporation's own financial statements for relevant periods before and after the alleged tort? Is it proper to deny all discovery of the corporation's financial statements for relevant times?**

**E. The compensatory and punitive damages awards were against the overwhelming**

**weight of the evidence.**

**III. IF THE CASE IS NEITHER REVERSED AND RENDERED, NOR REMANDED FOR NEW TRIAL, THE CASE SHOULD BE REMANDED FOR RE-TAXATION OF POST-JUDGMENT INTEREST ON THE COMPENSATORY AWARD AT 8% COMMENCING ON A DATE THREE AND ONE-HALF YEARS BEFORE THE FINAL JUDGMENT WAS ENTERED.**

## DISCUSSION OF LAW

**I. THIS COURT SHOULD REVERSE AND RENDER JUDGMENT FOR THE DEFENSE ON ALL CLAIMS BECAUSE THE PLAINTIFF'S PROOF WAS INSUFFICIENT.**

**A. The plaintiff alleged the Defendants induced Mr. Erik Broome, a former pharmacist of the Super D in Oxford, to steal a list of names and addresses of Super D customers, which list the plaintiff alleged was a trade secret. All of plaintiff's claims were preempted by the Uniform Trade Secrets Act, § 75-26-1, *et seq.* Miss. Code Ann. (1972).**

¶9. Super D filed its second amended complaint in this case on October 26, 1992. Super D alleged unfair competition, misappropriation of a trade secret, intentional interference with a business relationship, intentional interference with a lawful trade, and intentional interference with a business interest. All of the causes of action had as a central theme Fred's alleged role in the theft or use of the I.R.S. list. According to Fred's, shortly after the complaint was filed, Fred's moved for partial summary judgment, contending among other things, the plaintiff's state law claims were preempted by the Mississippi Uniform Trade Secrets Act. This motion was denied. However, this motion is not included in the record on appeal.

¶10. Fred's argues that all of Super D's claims other than misappropriation of a trade secret are preempted by the Mississippi Uniform Trade Secrets Act. Miss. Code Ann. § 75-26-15 (1991). That section states:

> (1) Except as provided in subsection (2), this chapter displaces conflicting tort, restitutionary and other law of this state providing civil remedies for misappropriation of a trade secret.

> (2) This chapter does not affect:

> (a) Contractual remedies, whether or not based upon misappropriation of a trade secret;

> (b) Other civil remedies that are not based upon misappropriation of a trade secret; or

> (c) Criminal remedies, whether or not based upon misappropriation of a trade secret.

Miss. Code Ann. § 75-26-15 (1991). Fred's argues that Super D's interference and other claims were preempted because they were all based on misappropriation of the I.R.S. list, which Super D claimed was a trade secret.

¶11. There is no Mississippi case law concerning the Uniform Trade Secrets Act. Fred's cites several

cases from other jurisdictions that have held the Uniform Trade Secrets Act preempts all state law claims based upon the misappropriation of a trade secret. The court in *Smithfield Ham and Products Co., Inc. v. Portion Pac, Inc.,* 905 F.Supp. 346, 348 (E.D. Va. 1995), held that "[i]n order to survive summary judgment, therefore, a plaintiff must be able to show that the distinct theories of relief sought are supported by facts unrelated to the misappropriation of the trade secret." *Smithfield Ham,* 905 F.Supp. at 348-49. Other federal courts have concluded that the preemption provision is intended to preclude only those common law claims that are premised entirely on a claim for the misappropriation of a trade secret. *See Coulter Corp. v. Leinert,* 869 F.Supp.732, 734 (E.D. Mo. 1994)("[T]he issue becomes whether allegations of trade secret misappropriation alone comprise the underlying wrong; if so, the cause of action is barred."); *Micro Display Systems, Inc. v. Axtel, Inc.,* 699 F.Supp. 202, 205 (D.Minn. 1988)("To the extent a cause of action exists in the commercial area not dependent on trade secrets, that cause of action continues to exist."); *Hutchison v. KFC Corp.,* 809 F.Supp. 68, 71-72 (D.Nev. 1992)(preempting "duplicative" claims for unjust enrichment and unfair competition under the UTSA, but considering the merits of alleged tortious interference claim).

¶12. Super D argues that based upon Subsection 2(a) of Miss. Code Ann. § 75-26-15 (1991), its other claims for relief are not preempted because those other claims are not based upon misappropriation of a trade secret. Therefore, it contends that the other claims are not "conflicting" within the meaning of the Act. Super D argues that each of its other claims involves facts and theories at least partially different from those involved in the pure trade secret claim. In *Micro Display Systems, supra,* the defendants moved for partial summary judgment on the ground that the plaintiff's claims were nothing more than a series of tort claims, disguised under various headings, for the misappropriation of trade secrets, and as such they were displaced by the Minnesota Uniform Trade Secrets Act. *Id.* at 204. The pertinent section of the Minnesota statute is identical to Mississippi's. That court said:

> Only that law which conflicts with the MUTSA is displaced. Conflicting law is that law dealing exclusively with trade secrets. To the extent a cause of action exists in the commercial area not dependent on trade secrets, that cause continues to exist. For example, in *Rehabilitation Specialists*, causes of action were allowed to be brought simultaneously for breach of a duty of loyalty and unfair competition, as well as for trade secrets. In that case the first two causes of action had as their underlying wrong the soliciting of customers and employees by the defendant while still employed by the plaintiff. The MUTSA claim was based on the misappropriation of the plaintiff's policy and procedures manual. The common law and statutory counts, therefore, addressed distinct "wrongs." The MUTSA used in this manner in not "a catch-all for industrial torts, but is the distinctive way in which to prosecute actions involving trade secrets.

*Id.* at 205. In *Smithfield Ham, supra,* the court interpreted the preemption provision of the Virginia statute which is identical to Mississippi's. The Court looked to the plaintiff's complaint and decided whether the common law claims could withstand summary judgment when stripped of the misappropriation language. It found the plaintiff's interference claims would withstand summary judgment even when stripped of that language. *Id.* at 349-50. The court focused on whether the failure of the misappropriation claim would doom the remaining counts as well. It found that the failure of the misappropriation claim would not doom the other common law claims, and therefore those claims were not dependent on the misappropriation of trade secret claim. Therefore, the court found the claims were not preempted. *Id.* at 350.

¶13. Super D argues that the logic of the *Smithfield Ham* case should be applied here, and we agree. It argues that its interference and other claims were not conflicting and were properly maintained and presented to the jury.

¶14. After a careful look at Super D's complaint, we conclude that Super D's other claims for relief are not preempted or displaced by the Mississippi Uniform Trade Secrets Act. Each of the claims could stand alone and withstand summary judgment even without Super D proving that the I.R.S. list was a trade secret. Each of the claims basically alleges that Broome and Fred's conspired to take and use the list for an economic advantage to the detriment of Super D. These claims are independent of the misappropriation of trade secret claim and not conflicting with the Mississippi Uniform Trade Secrets Act. This assignment of error is without merit.

### B. As a matter of law, the plaintiff failed to prove the list was a trade secret.

¶15. Fred's challenges the sufficiency of Super D's proof that the I.R.S. list was a trade secret. The Mississippi Uniform Trade Secrets Act defines "trade secret" as:

(d) "Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique or process, that:

(i) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and

(ii) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Miss. Code Ann. § 75-26-3(d) (1991).

¶16. The issue to be decided by this court is whether the I.R.S. list was a legally protectable trade secret as that term is defined by the Mississippi Uniform Trade Secrets Act. There is no Mississippi case law interpreting this statute, therefore it is a case of first impression for this Court. It is appropriate to look to the interpretations of other jurisdictions.

¶17. The I.R.S list was quite obviously a compilation of information. The first question is whether the list "[d]erives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use..." Miss. Code Ann. § 75-26-3(d)(i) (1991). The information contained on the I.R.S. list was partly information that was obtained by Super D when its customers filled out a patient history and insurance profile. However, all of the information obtained through the patient history was not reflected on the I.R.S. list. The list contained the patient's last name, first name, phone number, street address, city, state, zipcode, number of prescriptions filled in one year, and a dollar amount of the money spent on prescriptions at Super D for the year. Broome testified that as a pharmacist, he would consider the information on the I.R.S. list to be valuable information. Jerry Pardue, Vice President of loss prevention and human resources for Super D testified that the demographic information on the I.R.S. list had often been solicited by marketing companies. Casey, Senior Vice President of Fred's testified that Fred's would not release the amount of money an individual spent at Fred's in a given year to anyone other than that customer. Casey also testified that

Fred's would not consider printing up a list of its customers and giving it to Super D. He testified that it would be a disadvantage to Fred's to do that.

¶18. Other jurisdictions have addressed the question of what evidence will support a finding that a customer list meets the first prong of the "trade secret" definition. In California, the first prong of the "trade secret" definition states:

> (1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use;...

Cal. Civil Code § 3426.1(d) (West 1997). Although this prong is defined slightly differently than in Mississippi, a look at its interpretation is helpful. The remainder of the "trade secret" definition is identical to Mississippi's. In *Courtesy Temporary Service, Inc. v. Camacho,* 272 Cal. Rptr. 352 (Cal. Ct. App. 1990), the Court of Appeal found that a compilation of Courtesy's customers, who had demonstrated their willingness to use temporary employees, was the result of lengthy and expensive efforts, including advertising, promotional campaigns, canvassing, and client entertainment. *Courtesy,* 272 Cal. Rptr. at 354. The lower court had ruled that this "work effort" was not a secret entitled to protection. The Court of Appeal held that "it is this very 'work effort' or process of acquiring and retaining clientele, that constitutes a protectable trade secret." *Id.* at 357.

¶19. In another California case, *Morlife, Inc. v. Perry,* 66 Cal. Rptr.2d 731 (Cal. Ct. App. 1997), the first prong of the "trade secret" definition was examined. In that case, Morlife was in the business of inspecting, maintaining, and repairing roofs primarily for commercial properties. Perry had been with the company since its formation as a sales representative. Perry and another employee discussed starting their own roofing business. When Perry left Morlife, he took his collection of customer business cards he had accumulated over his six years of employment. According to Perry's testimony at trial, the customer cards represented approximately 75 to 80 percent of Morlife's customer base. Morlife sued Perry for misappropriation of a trade secret. Judgment was awarded for Morlife in the trial court. The appellate court upheld the findings of the trial court which had held:

> "Morlife provides a relatively unusual roofing service, namely, commercial roof repair and maintenance, as distinguished from replacement roofing. Its customer list was "a compilation, developed over a period of years, of names, addresses, and contact persons, containing pricing information and knowledge about particular roofs and roofing needs of customers using its services: as such, it has independent economic value. The identity of those particular commercial buildings using such services is not generally known to the roofing industry."

*Morlife,* 66 Cal. Rptr.2d at 735.

¶20. Under the Indiana Uniform Trade Secrets Act, the first prong of the "trade secret" definition is identical to that in Mississippi. In the case of *Kozuch v. CRA-MAR Video Center, Inc.,* 478 N.E.2d 110 (Ind. Ct. App. 1985), a video center sought to preliminarily enjoin a competitor from using its customer list. The trial court issued the injunction and the competitor appealed. The trial court's finding that the customer list met the first prong of the "trade secret" definition was upheld on appeal. The appellate court found that:

> There was evidence presented at trial that CRA-MAR's customer list included only the names of

owners of video hardware purchased at CRA-MAR and those who had purchased memberships in CRA-MAR's video rental club, and were therefore either customers or prospective customers for video movies. There was also evidence that the customer list could not have been created by any means other than through CRA-MAR's business operations. In addition, there was evidence that the list derived its independent economic value from not being generally known or ascertainable by CRA-MAR's competitors.

*Kozuch* 478 N.E.2d at 113.

¶21. We conclude that the I.R.S. list did meet the first prong of the "trade secret" definition. The information on the list had independent economic value as evidenced by the fact that marketing companies are willing to pay money to obtain it. Further, the information on the list, especially the amounts of money spent by customers of Super D and the number of prescriptions filled, was not information that was known to Fred's or that was generally ascertainable to them by proper means. Finally, Fred's could obtain economic value from the disclosure of the list. This is evidenced by the fact that Fred's would not give this type of information to Super D. Also, there is value in knowing which customers are big spenders on prescription medication because there is an inference that the bigger spenders are those with more health problems, and therefore customers that Fred's would like to have.

¶22. Neither Fred's nor Super D make any argument about this first prong of the "trade secret" definition. Fred's only asserts that Super D's I.R.S. list was not the subject of reasonable efforts to maintain its secrecy, which is the second prong of the definition. Super D asserts that it took reasonable steps to maintain the secrecy of the I.R.S list.

¶23. Evidence at trial showed that the I.R.S. list was printed out once a year from the computer. The computer was accessed through a password. The list was kept in an accordion folder on the pharmacy counter during those months of the year when it was used frequently. It was kept in an unlocked filing cabinet when it was not being used frequently. The pharmacy platform was located in the back left corner of the building. There was a gate without a locking device at the entrance of the pharmacy platform. Access to the pharmacy was limited to pharmacists, pharmacy technicians, pharmacy students in internships, stock persons, and when absolutely necessary a counter person. People such as pest control servicemen were also allowed behind the counter, but were carefully monitored. Broome was not required to sign any sort of termination agreement ensuring confidentiality when he left Super D. However, a district manager who left Super D was. The list was not stamped with any sort of language identifying it as a secret or confidential. Broome testified he was never told the list was a trade secret. Broome said that he did not recall there ever being any trade secret policy. There were no instructions given to employees about what to do with the list after April 15th. Klepzig tossed it in the dumpster. Pardue testified that Super D would classify a customer list as a trade secret. Pardue testified that Super D had an employee handbook and an operations manual which both discussed confidential information. Neither the manual nor the handbook specifically mentioned trade secrets. Other than that, Pardue testified that Super D relies on the education of its pharmacists concerning ethics. Pardue testified that the patient history form, from which the I.R.S. list is compiled, tells the patient before he fills it out that all information is confidential.

¶24. Other jurisdictions have considered the question of what are "efforts that are reasonable under the circumstances to maintain secrecy." The Supreme Court of Alabama considered the question in *Allied Supply Co., Inc. v. Brown,* 585 So. 2d 33 (Ala. 1991). Allied contended that some former employees had misappropriated customer and vendor lists before they left Allied. The Supreme Court found that at least 10 Allied employees had access to the lists. The lists were not marked "confidential." The lists were taken home by employees. Multiple copies of each list existed, and the information on the lists was contained in the receptionist's Rolodex. *Allied Supply,* 585 So. 2d at 36. The Court held that in light of the evidence, "Allied did not meet its burden of showing that it had taken reasonable steps to ensure that the lists remained a 'trade secret'." *Id.*

¶25. In a Louisiana case, *Wyatt v. PO2, Inc.,* 651 So. 2d 359 (La. Ct. App. 1995), where a former employee used the identities of PO2's clients in a new business, a Louisiana district court found that the client's identities were not a trade secret. Specifically, the court found that the PO2 computer had no access code to restrict entry and that there was no evidence of any contractual agreement regarding confidentiality of PO2 information or restricting competition. *Wyatt,* 651 So. 2d at 363.

¶26. In *Courtesy Temporary Service, Inc. v. Camacho, supra,* the California Court of Appeal found that Courtesy had taken reasonable steps to maintain the secrecy of its customer list where information on the list was not divulged to anyone outside of its business, employees were allowed access to the information on an "as needed basis" to perform their duties and access was limited to the branch in which they worked, and employees were told of the confidential and proprietary nature of the information. *Id.* at 358.

¶27. In an Indiana case, *Ackerman v. Kimball International, Inc.,* 634 N.E.2d 778 (Ind. Ct. App. 1994), adopted in part by 652 N.E.2d 507 (Ind. 1995), the Court of Appeals held that customer and supplier lists and pricing information were trade secrets where the number of employees who had access to the information was limited, employees who did have access were instructed not to disclose it, the computer on which the information was stored was accessible only by password, and the computer displayed notice to the user indicating the proprietary nature of the information. *Ackerman,* 634 N.E.2d at 783.

¶28. After a close examination of the facts in the case *sub judice,* we find that Super D's I.R.S. list was the "subject of efforts that are reasonable under the circumstances to maintain its secrecy." Miss. Code Ann. § 75-26-3(d)(ii) (1991). Access to the computer on which the list was stored was obtainable only through password. The list was printed out once a year, and was then maintained in the pharmacy platform area. We note specifically that we find it persuasive that the list was maintained in the same area as the prescription drugs to which any pharmacy should carefully monitor access. There was no evidence that Super D did not carefully monitor its drugs. The information on the I.R.S. list was also not divulged to anyone outside of the business save the customer who requested an accounting of his expenditures for the year. When a request was made by a customer, the pharmacist would look up the information and write it on a separate sheet of paper to give to the customer. This sheet of paper could be signed, as a pharmacist, only by Klepzig or Broome. The number of employees who had access to this list was limited and available only to those employees who needed to know the information. Although we do not find the steps taken by Super D to maintain secrecy to be elaborate steps, we do find them to be reasonable, and that will suffice. We find these steps to be particularly reasonable in this case because of the unique security necessary to

protect prescription drugs in the pharmacy setting. If this list had been maintained behind the front counter of the Super D store as opposed to the pharmacy platform area, we may have decided this case differently. All that said, we conclude that the I.R.S. list was a trade secret as that term is defined by the Mississippi Uniform Trade Secrets Act, and this assignment of error is without merit.

### C. Mr. Broome testified at trial that he took the list on his own, without any involvement of the defendants. The lower court should have granted the defense motions for judgment as a matter of law, that the defendants did not induce Mr. Broome to take the list.

¶29. Fred's argues that Super D pleaded in its Second Amended Complaint, under its various theories of recovery, that Fred's induced Broome to steal the I.R.S. list. Fred's contends that there was no evidence adduced at trial to support the theory that Fred's induced Broome to steal the list. Therefore, Fred's asserts that the trial court should have granted its motions for judgment as a matter of law, and this Court should reverse and render this case. Fred's motions for directed verdict, jnov, and new trial were denied. It assigned as error the insufficiency of the proof on this point in each of those motions.

¶30. Super D argues that while it did specifically accuse Fred's of prior knowledge of the theft in its complaint, it also fully pled the theory that Fred's was involved in a conspiracy with Broome to gain an unfair advantage over Super D through use of its secret information. It argues that the Complaint was in compliance with Miss.R.Civ.P. 8(a) and (f), and that Fred's was given notice that the overall thrust of Super D's Complaint charged an ongoing conspiracy.

¶31. In its Reply Brief, Fred's argues that all of Super D's claims were based upon conspiracy by Fred's and Broome for Broome to remove the list. Fred's cites to the Comment to Miss.R.Civ.P. 15 to support its position that Super D was required to prove the claims it pleaded in order to recover. That Comment states:

> It is an invariable principle of practice that the admissible proof in any case must come within the allegations of the pleadings and that it avails nothing to prove what is not charged.

Miss.R.Civ.P. 15, Cmt.

¶32. A look at the Complaint shows that Super D did plead that Fred's conspired with Broome to steal the I.R.S. list. But, it also alleges throughout, an ongoing conspiracy to gain an unfair competitive advantage. For example, in the Third Cause of Action, Super D alleges that Defendant's Broome, Fred's, and Fred's Inc. wrongfully took the list. However, within that same cause of action, Super D alleges that Fred's Inc. received the list from Broome following his removal of it from Super D, and that Fred's then used the list to mail out the letters. Even if Super D could not prove that Fred's induced Broome to take the list, it still could have proved that Fred's received the list from Broome and Fred's used it unfairly.

¶33. Under Miss.R.Civ.P. 8, we find that Super D's complaint was sufficient and that the proof at trial conformed, even though Super D could not prove that Fred's induced Broome to take the list. This assignment of error is meritless.

### D. No customer on the list testified he shopped at Fred's instead of Super D because he

**received such a letter. The plaintiff's proof of proximate cause was insufficient.**

¶34. Fred's argues that Super D failed to prove proximate cause. It asserts that Super D should have been required to prove more than a difference in customer count, prescriptions filled and sales at its Oxford store before and after Broome's letter. Citing *Cenac v. Murry,* 609 So. 2d 1257, 1272 (Miss. 1992), Fred's contends that Super D should have been required to prove that customers were induced to shop at Fred's instead of Super D because they received the letter. Fred's argues that Super D had Exhibit P-1, a list of thousands of names and addresses from which they should have called witnesses to the stand to testify that they shopped at Fred's instead of Super D because of Broome's letter.

¶35. Super D argues that it did prove that at least 150 customers who received the Broome letter switched their business to Fred's. This, Super D contends was proved through Exhibit P-17 which was a list of names that the parties prepared during settlement negotiations showing common customers. It showed 150 customers who had moved to Fred's and how much money they had spent at Fred's.

¶36. In *Cenac v. Murry, supra,* this Court examined the proof necessary to prove the tort of tortious interference with business relations. In that case, the Court found that the Cenacs had failed to prove through hard evidence that Murry's interference with the Cenacs' store had caused a financial loss. The Cenacs presented two lists of customers who no longer traded with their store as a result of Murry's interference, but the Chancellor did not admit the list into evidence. The only other proof the Cenacs presented was the testimony of one customer that he no longer traded with the Cenacs because of Murry's interference. *Id.* This Court found that "absent from the record is the 'hard proof' of the financial ruin which the Cenacs allege." *Id.*

*¶37.* The case *sub judice* is distinguishable from *Cenac.* Although Super D did not put actual customers on the stand to testify that because of Broome's letter they switched their business to Fred's, Super D did admit into evidence a list of 150 customers who had shopped at Super D before Broome's letter, and were shopping at Fred's after Broome's letter. The list included the amounts that those customers were no longer spending at Super D, and were now spending at Fred's. This is the "hard proof" that was absent in *Cenac.* In *Cenac,* this Court stated:

> For absent form the record is the "hard proof" of the financial ruin which the Cenacs allege. This loss would be proved by illustrating the store's volume of business and profit while Murry owned the store (or when he was away from McLaurin) compared to the level of business when Murry was present and living next door.

*Id.* Super D put on proof of its loss of volume of business and profit from before Broome's letter compared to that level after Broome's letter. This was sufficient proof of proximate cause, and this assignment of error is meritless.

**E. The plaintiff's proof of damages was insufficient. Among other things, the plaintiff did not prove loss of net profits.**

¶38. Fred's argues that Super D's proof of damages was insufficient. First, it argues that damages for lost sales was not proved through lost net profit, but instead through lost gross profit, and therefore the proof was insufficient. Second, it alleges that Super D's claim for damages of $650 for the

recreation of the I.R.S. list which Fred's shredded was an out-of-pocket expense and not a compensable element of damages.

¶39. Regarding the issue of damages for lost sales, Super D had two witnesses testify. Pardue testified that Super D undertook several analyses to determine the damage to Super D from the theft of the I.R.S. list. Under the first analysis, Pardue through the controller of the company, prepared graphs showing number of prescriptions filled, prescription sales, average prescription sales, customer accounts, and total sales both before the list disappeared and after the list disappeared. These figures were derived from the operating statements of the Super D store and were based on a 28 week operating period. That analysis showed that from 1990 to 1991(from before the list was taken to after the list was taken), prescription sales increased by only $2000, which was substantially less than it had increased for the same 28 week period in prior years. Prescriptions filled dropped from 1990 to 1991 by approximately 1300 prescriptions. That number had been on the rise in prior years. Customer accounts dropped by approximately 28,000 between 1990 and 1991. Total sales dropped by approximately $120,000 between 1990 and 1991 for the 28 week period. Pardue testified that he did not come up with a net profit figure.

¶40. In its second analysis, Super D used the customer list that it and Fred's had prepared in settlement negotiations comparing common customer before and after the taking of the list. In order to do the comparison, the parties set some parameters. The customer had to be a regular customer of Super D, which was evidenced by that customer having had a prescription filled at Super D within the last 3 months prior to the taking of the list. The customer must then have used Fred's after the list was taken (May 1991) and the customer was not considered if he had returned to Super D by January of 1992. That comparison led to a list of 150 customers. Pardue testified that from that number, Super D calculated its loss in prescription sales to be $25,000 in a 28 week period. The annualized figure was $50,000. Super D then calculated its average over the counter sales per prescription filled and found that it was $48 per prescription filled in 1990 and $36 per prescription filled in 1991. Super D then multiplied that figure by the number of prescriptions filled and arrived at a sales figure of $629, 964. Super D then compared sales in 1990 and 1991 and came up with a total sales loss figure of $322,866. Pardue was then questioned about whether he had come up with a net profit figure. He testified that he did not know how because the store had a negative net profit. He then measured cost of goods sold at 30% and came up with a gross profit loss of 96,860 (over the counter sales) + 50,000 (prescription sales)= $146,860.

¶41. Henry Beattie, C.P.A. also conducted an analysis for Super D and testified as an expert witness. In May of 1991, he was CEO of M & H Drugs as well as for Super D, which is the holding company of M & H. He testified that he had been involved in buying drugstores over the years, and was familiar with analyzing financial statements. Beattie conducted an operating cash flow analysis. He determined from operating statements that the annualized drop off in gross profit was $65,949. He then applied a multiple of 8 to that figure to account for future consequences of the loss of the list. He arrived at a loss figure of $527, 592. Beattie also testified to net income loss from the operating statement of the Oxford store.

¶42. Pardue was cross examined by counsel for Fred's. That cross examination presented evidence to the jury that Super D's operating statements did not take into account deductions for items such as interest, taxes, and depreciation of M & H. It was also made clear to the jury that numbers presented

were gross profit figures.

¶43. Fred's argues that in Mississippi, damages from lost sales are measured in terms of net profits, not the amount of lost sales or lost gross profits. It cites *Stephens v. Brock,* 568 So. 2d 702 (Miss. 1990), which was a case concerning damage to crops. In that case, this Court found where the plaintiffs produced proof only of gross revenues anticipated, the damage award was improper. *Stephens,* 568 So. 2d at 705. In *Lovett v. E.L. Garner, Inc.,* 511 So. 2d 1346 (Miss. 1987), this Court discussing damages in a breach of contract case said, "In calculating loss of future profits, such loss is that of net profits as opposed to gross profits" and that "... future profits should always be discounted at an appropriate rate to arrive at present value." *Lovett,* 511 So. 2d at 1353. In *Cook Industries, Inc. v. Carlson,* the federal district court in the Northern District of Mississippi defined net profit as "the gross amount that would have been received pursuant to the business or investment that was interrupted by a defendant's wrongful act, less the cost of running the business or attempting the investment." *Cook Industries, Inc. v. Carlson,* 334 F.Supp. 809, 817 (N.D. Miss. 1971). "Claims for loss of profits arise more often in breach of contract cases than in tort situations, but the method of computing damages is the same." *Cook Industries,* 334 F.Supp. at 817. "In Mississippi, one may recover for loss of future profits in a breach of contract action as long as such profits are proved with reasonable certainty, not based on speculation or conjecture." *Lovett,* 511 So. 2d at 1353.

¶44. Fred's contends that Super D's proof of lost sales and lost gross profit was irrelevant without any proof of lost net profit and should have been excluded. Super D argues that although the proof of lost sales was not "technically describable as 'net profits', they nonetheless were presented in a manner which promoted the jury's factoring in the 'overhead' to reach a net result." Super D relies on the fact that Pardue was cross examined concerning deductions that were not taken into account in his figures. Super D argues that damages are not precluded because they are uncertain, and that what must be shown is a foundation on which the jury can form a reasonable computation. It cites *Ham Marine, Inc. v. Dresser Industries, Inc.,* 72 F.3d 454 (5thCir. 1995) to support its position. In that case, Dresser argued that Ham had presented no factual evidence from which the jury could accurately calculate reasonable net profits, and therefore Dresser contended that Ham had failed to prove its damages with legal certainty. The Court said, "[t]he right to recover is not precluded by uncertainty regarding the exact amount of damages. The evidence need only lay a foundation upon which the trier of fact can form a fair and reasonable assessment of the amount of Ham's damage." *Ham Marine,* 72 F.3d at 462 (citations ommitted).

¶45. The jury awarded compensatory damages in the amount of $56,750 in this case. It does appear that Super D presented only gross profit figures, which is inadequate under Mississippi law. Plaintiffs are required to prove loss of net profits, and we conclude that Super D failed in that respect. Under *Lovett, supra,* this Court reverses the damages for loss of profits and on this issue renders judgment for Fred's.

*¶46.* As to Super D's claim for $650 in damages for the recreation of the I.R.S. list, Fred's argues that that cost was an expense of litigation, and was therefore, not compensable. Fred's cites the comment to Miss.R.Civ.P. 54(d) to support its position. The Comment states:

> *Expenses* include all the expenditures actually made by a litigant in connection with the action. Both fees and costs are expenses but by no means constitute all of them. Absent a special

statute or rule, or an exceptional exercise of judicial discretion, such items as attorney's fees, travel expenditures, and investigatory expenses will not qualify either as statutory fees or reimbursable costs. These expenses must be borne by the litigants.

Super D argues that Fred's position assumes that the only reason that Super D recreated the list was to promote litigation, which Super D asserts is untrue. Super D argues that the recreation was necessitated by Super D's operating and informational needs. It asserts that the $650 was a direct element of damages proximately caused by Fred's willful destruction of the original list.

¶47. Fred's claim is without merit, and Super D's argument is well taken. Fred's caused damage to Super D in the amount of $650 when it destroyed the original list. This damage is compensable and will not be reversed.

### II. THE CASE SHOULD BE REMANDED FOR NEW TRIAL ON COMPENSATORY AND PUNITIVE DAMAGES, EVEN IF THE COURT HOLDS PLAINTIFF'S EVIDENCE WAS SUFFICIENT.

### A. The lower court allowed the plaintiff to withhold the most important piece of evidence in the trial from discovery, under claim of confidentiality. The lower court then admitted the evidence and allowed the plaintiff to publish the evidence to the jury, in effect waiving the claim of confidentiality. Was this "trial by ambush" proper?

¶48. Fred's complains that Super D was allowed to admit into evidence a "recreated" copy of the I.R.S. list. This list was recreated because Fred's destroyed the original. Fred's contends that Super D violated discovery rules by not providing the recreated list when it was requested. In response to the request for production, Super D acknowledged the existence of the list but refused to produce it without a suitable protective order because Super D considered the list confidential. Fred's filed a Motion to Compel production of the I.R.S. list which was denied. Fred's did not file a Motion in Limine to limit the use of this list at trial. Fred's did object to its introduction.

¶49. Fred's complains that it had no fair chance to respond to the "attack" by Super D in offering the recreated list at trial. It argues that this recreated list was substantially different than the original list in that the recreated list did not include Super D as a customer, it was on differently sized paper, there was a column for "number of prescriptions filled" on the recreated list that was not on the original, and there was a heading on each page of the recreated list that had not been on the original.

¶50. Super D argues that Fred's was not surprised by the information on the list. It argues that Fred's did not even seek a continuance at trial to review the exhibit. It did not need to do so, Super D argues, because the information on the list was not a surprise. Super D argues that any minor differences in the original and the recreated list could not have prejudiced Fred's in that it had to alter or amend its defenses in any way. Super D also argues Fred's had actual notice that Super D would use the list, because it acknowledged the existence of the list in the request for production and Super D refused to produce it because it was confidential. Further, Super D claimed the cost of recreation of list as an element of damages. Super D claims Fred's knew what was on the list because Fred's corporate representatives had seen the list before they shredded it. Ultimately, Super D asserts that Fred's cannot show that it was harmed in any way by the denial of pre-trial access to the list.

¶51. As Fred's argues, "[t]his Court has developed strict discovery rules in order to avoid trial by ambush and to insure each party has a reasonable time to prepare for trial. We are committed to the discovery rules because they promote fair trials. Once an opponent requests discoverable material, an attorney has a duty to comply with the request regardless of the advantage a surprise may bring." *Williams v. Dixie Electric Power Ass'n,* 514 So. 2d 332, 335 (Miss. 1987). Fred's contends that Super D should not have been allowed to hide behind the claim of confidentiality before trial, and then waive the claim at trial. It cites several cases from other jurisdictions to support its position. For example, in *Gutierrez-Rodriguez v. Cartegena,* 882 F.2d 553, 577 (1stCir. 1989), the Court said, "A defendant may not use the fifth amendment to shield herself from the opposition's inquiries during discovery only to impale her accusers with surprise testimony at trial." *See also **Pack v. Beyer,*** 157 F.R.D. 219, 221-22 (D.N.J. 1993)(absent extraordinary circumstances a party cannot use an official information privilege or a qualified state secrets privilege to avoid discovery while expecting to use the information he claims to be privileged at summary judgment or trial); *Int'l Telephone & Telegraph Corp. v. United Telephone Co. of Florida,* 60 F.R.D. 177, 186 (M.D. Fla. 1973)(a party cannot avoid pretrial discovery by asserting the attorney client privilege as to information he intends to produce at trial.); *Southern Bell Telephone & Telegraph Co. v. Kaminester,* 400 So. 2d 804, 806-07 (Fla. Dist. Ct. App. 1981)(a party cannot assert a medical privilege during discovery as to information he intends to produce at trial.).

¶52. Super D argues that matters of discovery are left to the sound discretion of the trial court. *Dawkins v. Redd Pest Control Co., Inc.,* 607 So. 2d 1232, 1235 (Miss. 1992). Discovery orders will not be disturbed unless there has been an abuse of discretion. *Dawkins,* 607 So. 2d at 1235. "Where, however, limitations on discovery are improvidently ordered or allowed and important information is denied a litigant reversal will obtain." *Id.*

*¶53.* We cannot say that the trial court abused its discretion in refusing to compel Super D to produce the recreated list. One theory that Super D based recovery on was that the original list was a trade secret. Therefore, it was reasonable for Super D to claim that the recreated list was confidential. Additionally, Fred's has not shown that it was prejudiced by not having the recreated list prior to trial.

> **B. The lower court allowed the plaintiff to prove statements made by the defendants during settlement discussions. The statements were not made to plaintiff at any other time or circumstance. Did these rulings violate MRE 408 and require a new trial?**

¶54. Fred's contends in this assignment of error that the trial court erred in admitting into evidence Exhibit P-17, which was a list of common customers prepared in settlement negotiations, and in allowing testimony about Fred's agreements during settlement negotiations. Super D tendered P-17 during Jerry Pardue's testimony, and Fred's objected. Mr. Pardue testified that the parties had worked together to compare their respective customers, to identify prescription customers who had moved to Fred's, that 150 customers and how much they had spent were identified on P-17 with the agreement of Fred's. Pardue never mentioned that Fred's and Super D had been in settlement talks. The relevant testimony was as follows:

> A. Yes, sir. During January and February and March of '92 just following this incident we did some studies to attempt to determine the damage that this letter of solicitation through theft of

that list had caused. Again if I can use the same analogy a torpedo had hit the ship and the captain wants to know how bad we are hurt. So we worked with people from Fred's and we compared our list, our computer list, our customer list with the customer list with their customer list in their presence and by their agreement. We compared these two lists.

.....

Q. And did you come up with a number of customers that fit the parameters you just described for the ladies and gentlemen of the jury?

A. Yes, we did. And this was with and by agreement with Fred's. We identified--.

BY MR. DUNBAR: Same objection.

.....

A. We identified collectively with Fred's, Super D, we identified 150 prescription customers who were eligible according to the criteria that we had laid down.

.....

Q. Mr. Pardue, you were asked just a moment ago about the 150 names that you and Fred's came up with?

A. Yes, sir.

Q. Does that appear to be the 150 names?

A. Yes, sir.

¶55. Mississippi Rule of Evidence 408 states in pertinent part:

Evidence of conduct or statements made in compromise negotiations is likewise not admissible.

Fred's argues that if defendants' statements about damages during settlement discussions will be admissible at trial, there will be many fewer settlement discussions. It argues that this error was substantial in that it left the impression with the jury that Fred's had agreed it gained Super D customers because of Broome's letter. Fred's also argues that Pardue could not be cross-examined on this point without compounding the error.

¶56. Super D argues first, that P-17 was not the product of pure settlement negotiations because the information contained there was otherwise discoverable. Therefore, Super D contends the evidence was admissibl e and relevant. "This rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations." Miss.R.Evid. 408. Super D also argues that P-17 was raw data and not "statements" or "conduct" under Miss.R.Evid. 408.

¶57. We conclude that the trial court did not err in admitting Exhibit P-17 into evidence. This information was otherwise discoverable, and is not the type of "statement" or "conduct" that the rule contemplates as being precluded. This assignment of error is meritless.

**C. Was it reversible error to instruct the jury by repeated abstract statements of law, which failed to instruct the jury correctly?**

¶58. Fred's claims that the jury was not properly instructed in this case. Specifically, Fred's argues that Instructions P-1, P-2, P-3, P-4, P-5, P-7, P-8, P-9A, P-12A, and P-23 were abstract. As an example, Fred's argues that "P-1 just itemized abstract elements of the tort of interference with prospective economic advantage, and instructed the jury to find for the Plaintiff, if the jury found the Plaintiff had proved them. There was no instruction in P-1 about what constituted sufficient proof of those elements. The rest of the instructions for the Plaintiff had the same defect." Fred's also claims that the punitive instructions did not instruct the jury to the consider the factors required by Miss. Code Ann. § 11-1-65 (Supp. 1997).

¶59. This Court has said, "[o]n appeal, we do not review jury instructions in isolation; rather, they are read as a whole to determine if the jury was properly instructed." *Wallace v. Thornton,* 672 So. 2d 724, 729 (Miss. 1996)(citing *People's Bank and Trust Co. v. Cermack,* 658 So. 2d 1352, 1356 (Miss. 1995)). "Therefore, defects in specific instructions do not require reversal 'where all instructions taken as a whole fairly--although not perfectly--announce the applicable primary rules of law.'" *Wallace,* 672 So. 2d at 729 (quoting *Burton v. Barnett,* 615 So. 2d 580, 583 (Miss. 1993). "However, if those instructions do not fairly or adequately instruct the jury, this Court can and will reverse." *Wallace,* 672 So. 2d at 729 (citing *Burton,* 615 So. 2d at 583) "Instructions should be tied to the specific facts of the case and when given merely in the abstract, may be grounds for error." *T.K. Stanley, Inc. v. Cason,* 614 So. 2d 942, 952 (Miss. 1992). "Of late where we instruct our juries that all instructions must be considered as a whole, we do not consider abstractness as much of a vice, though we still do not regard it a virtue." *Splain v. Hines,* 609 So. 2d 1234, 1241 (Miss. 1992). "The test to determine whether or not an instruction is abstract is to determine whether or not the instruction relates to facts shown by the evidence on the issues involved in the case. If an instruction merely relates a principle of law without relating it to an issue in the case, it is an abstract instruction and should not be given by the Court." *Freeze v. Taylor,* 257 So. 2d 509, 511 (Miss. 1972). "The granting of an abstract instruction is not ordinarily considered to be a reversible error unless it tends to confuse and mislead the jury." *Freeze,* 257 So. 2d at 511.

¶60. Super D argues that although a number of the instructions stressed pure elements of law rather than centering on specific facts of the case, the instructions were clear and rooted in the applicable law. Therefore, Super D contends that the instructions were sufficient when read in conjunction with the remaining instructions, and are not cause for reversal. Super D argues that although some of the instructions may have been abstract, this Court should not reverse unless they tended to confuse or mislead the jury.

¶61. The compensatory instructions complained of by Fred's do appear to be abstract. The question to be decided by the Court is whether these abstract instructions warrant reversal of the case. When read as a whole with all of the other instructions, the jury was fairly instructed in this case. We find that these instructions would not tend to confuse or mislead the jury, and therefore, we hold any error for abstractness to be harmless. Additionally, this assignment for error is moot as this Court is reversing this case on the issue of compensatory damages for loss of profits.

¶62. Fred's final complaint concerning jury instructions is that the punitive damages instructions were

inadequate because the jury was not instructed to consider the factors required by Miss. Code Ann. § 11-1-65 (Supp. 1997). It asserts that the statute should be read to require the court below to instruct the jury on statutory factors for assessing punitive damages. Miss. Code Ann. § 11-1-65(1)(e) states:

> In all cases involving an award of punitive damages, the fact finder, in determining the amount of punitive damages, shall consider, to the extent relevant, the following: the defendant's financial condition and net worth; the nature and reprehensibility of the defendant's wrongdoing, for example, the impact of the defendant's conduct on the plaintiff, or the relationship of the defendant to the plaintiff; the defendant's awareness of the amount of harm being caused and the defendant's motivation in causing such harm; the duration of the defendant's misconduct and whether the defendant attempted to conceal such misconduct; and any other circumstances shown by the evidence that bear on determining a proper amount of punitive damages. The trier of fact shall be instructed that the primary purpose of punitive damages is to punish the wrongdoer and deter similar misconduct in the future by the defendant and others while the purpose of compensatory damages is to make the plaintiff whole.

Miss. Code Ann. § 11-1-65(1)(e) (Supp. 1997). Super D argues that Fred's did not request an instruction containing the statutory language, and should not be heard to complain now. However, Fred's did object to the instructions on this basis, and therefore this issue is properly before the Court. It also asserts that the instructions given on punitive damages were modeled on Mississippi Model Jury Instructions, case law, and Counterpart Federal Model Instructions. Fred's argues that the instructions given ignored the very problems cited by this Court in *Harvey-Latham Real Estate v. Underwriters at Lloyd's London,* 574 So. 2d 13, 17 (Miss. 1990), where this Court said, "[i]t is imperative that some parameters be developed for the guidance of juries and courts fixing the amount of punitive damages."

¶63. Through P-5, P-7, and P-8, the jurors were fully instructed as to the purpose of punitive damages and as to the proof necessary to award them. Fred's argument must fail. First, this section of the statute was not in effect at the time of the filing of Super D's action. See Editor's Note Miss. Code Ann. § 11-1-65 (Supp.1997). Furthermore, the record reveals that Super D put on evidence of each of the factors in Subsection (e) at trial. Therefore, we find this assignment of error to be without merit.

> **D. Regardless of the measure of damages, is the corporation required to prove its damages by the best evidence? Does the best evidence include the corporation's own financial statements for relevant periods before and after the alleged tort? Is it proper to deny all discovery of the corporation's financial statements for relevant times?**

> **1. <u>Failure to require plaintiff's best evidence of damages.</u>**

¶64. This claim for error is moot because the compensatory damages for loss of profits is reversed and rendered.

> **2. <u>Denial of discovery of financial information.</u>**

¶65. Super D objected to Fred's request for production of M & H's financial information on the ground that the request was irrelevant, unduly burdensome, vague, and ambiguous, and that the

request literally requested all the financial information of the corporation. Fred's filed a motion to compel, and the trial court denied the motion without explanation. Fred's argues that this denial constitutes plain error and is a substantial deprivation of discovery sufficient to require a new trial.

¶66. The trial court's grant or denial of a motion to compel is subject to an abuse of discretion standard of review on appeal. *Taylor Machine Works, Inc. v. Great American Surplus Lines Ins. Co.,* 635 So. 2d 1357, 1363 (Miss. 1994). "Where, however, limitations on discovery are improvidently ordered or allowed and important information is denied a litigant reversal will obtain." *Dawkins v. Redd Pest Control Co., Inc.,* 607 So. 2d 1232, 1235 (Miss. 1992). In *Dawkins,* guidelines were enumerated for determining whether there was an abuse of discretion:

> [A] trial court's discretion in the discovery area is generally guided by the principles that (a) the court follow the general policy that discovery be encouraged, (b) limitations on discovery should be respected but not extended, (c) while the exercise of discretion depends on the parties' factual showings disputed facts should be construed in favor [of] discovery, and (d) while the importance of the information must be weighed against the hardships and cost of production and its availability through other means, it is preferable for the court to impose partial limitations on discovery rather than an outright denial. Any record which indicates a failure to give adequate consideration to these concepts is subject to the attack of abuse of discretion, regardless of the fact that the order shows no such abuse on its face.

*Id.* at 1236 (quoting 23 Am. Jur. 2d, Depositions and Discovery § 5 (1983)).

¶67. We find that the trial court did not abuse its discretion in denying Fred's motion to compel "all financial information" of M & H Drugs. This was an overly burdensome request and was properly denied.

### 3. **Error in proof of other elements of damage.**

¶68. Super D claimed damages for the cost of reprinting the customer list. Fred's asserts that proof of these damages was not proved through Super D's best evidence. Pardue testified that Joe King told him how much recreation of the customer list had cost. Fred's counsel objected to hearsay. Super D's counsel admonished Pardue not to say what he was told. Then, Pardue answered, "It took 13 hours to recreate and that is being conservative at $50 dollars an hour, so the cost of it was $650. Fred's counsel also objected on best evidence grounds, but did so prior to Pardue's final answer. Super D argues that this issue was not preserved for review due to the lack of a contemporaneous objection. Aside from the procedural bar, it argues that damages proved by reasonable certainty shall withstand scrutiny. Fred's argues that the testimony was hearsay, and should not have been admitted *in lieu* of documentation.

¶69. Pardue's testimony is not clearly hearsay. He was not asked what Joe King told him about the cost of recreation, and he did not respond with "Joe King told me that it cost $650." He couched his response in terms that technically do not amount to hearsay. Documentation certainly would have been the best evidence of the cost of the recreation of the customer list. However, this evidence was adequate because Pardue gave information about the number of hours spent and the cost per hour to recreate the document. In that sense, it was not speculative or simply conjecture. This assignment of error is without merit.

**E. The compensatory and punitive damages awards were against the overwhelming weight of the evidence.**

¶70. Fred's contends that the compensatory and punitive damage awards in this case were against the overwhelming weight of the evidence. As to the compensatory award, Fred's argues that Super D did not seek this amount and therefore it appears that the verdict bears no reasonable relationship to the loss suffered. Fred's also contends that the punitive award was against the overwhelming weight of the evidence. It argues that the letter sent out by Fred's was simply an announcement of Broome's change in jobs, and that it stated nothing malicious or false. Fred's asserts that the mail out was counterproductive because it was inadvertently sent to many people who were not even Broome's customers.

¶71. This Court may disturb the jury verdict only if the Court "finds that the damages are excessive or inadequate for the reason that the jury was influenced by bias, prejudice, or passion, so as to shock the conscience or that the damages awarded were contrary to the overwhelming weight of credible evidence." *Junior Food Stores, Inc. v. Rice,* 671 So. 2d 67, 76 (Miss. 1996)(citing *Andrew Jackson Life Ins. Co. v. Williams,* 566 So. 2d 1172, 1190 (Miss. 1990)). This Court is not authorized to disturb a jury verdict as to damages because it "seems too high" or "seems too low." *C & C Trucking Co. v. Smith,* 612 So. 2d 1092, 1106 (Miss. 1992)(quoting *Royal Oil Co., Inc. v. Wells,* 500 So. 2d 439, 449 (Miss. 1986)). In reviewing the jury's damage awards, this Court resolves all conflicts in the evidence in favor of the appellee. *Junior Food Stores, Inc.,* 671 So. 2d at 75.

¶72. Super D argues that:

> In this case, the jury was presented with evidence that Fred's through its corporate representatives, acted in complicity with Eric Broome to purloin and unfairly use Super D's customer list. After Fred's, as it says, "became concerned" about possession of the stolen list, Fred's corporate representatives directed that the list be shredded to cover up the evidence of its illicit participation. The jury in this case had evidence of theft, destruction of evidence, and use of the stolen list to secure an unfair advantage. They awarded actual damages far lower than could have been awarded on the facts and lower than those requested. Faced with the bad faith acts of Fred's representatives, their punitive award of just a fraction of Fred's net worth, can hardly be assailed as excessive.

We find that the compensatory award for loss of profits was not supported by the evidence because Super D failed to prove loss of net profits. We find that $650 in compensatory damages was properly awarded for recreation of the I.R.S. list, and that the punitive damage award was not against the overwhelming weight of the evidence.

**III. IF THE CASE IS NEITHER REVERSED AND RENDERED, NOR REMANDED FOR NEW TRIAL, THE CASE SHOULD BE REMANDED FOR RE-TAXATION OF POST-JUDGMENT INTEREST ON THE COMPENSATORY AWARD AT 8% COMMENCING ON A DATE THREE AND ONE-HALF YEARS BEFORE THE FINAL JUDGMENT WAS ENTERED.**

¶73. Fred's argues that the trial court erred in taxing post-judgment interest at 8% commencing on October 26, 1992. It asserts that this allowance of interest is in effect pre-judgment interest, and that

8% provides Super D with a windfall. Fred's contends that Miss. Code Ann. § 75-17-7 (1991) should be construed to mean that 8% is a ceiling but that post-judgment interest should never exceed current market rates of interest. Fred's argues that although the enabling statute allows the trial court to award interest from the date of the original complaint, the trial court in the case *sub judice* abused its discretion. Fred's argues that the parties agreed to a continuance to discuss a possible joining of Fred's and Super D, and as such it should not have to pay interest for the two and one half year delay that resulted.

¶74. Super D argues that Fred's cites no authority to support this contention, and that unless the legislature deems a change appropriate, this Court is bound to uphold the statutory law. Miss. Code Ann. § 75-17-7 (1991) provides in pertinent part:

> All other judgments or decrees shall bear interest at a per annum rate set by the judge hearing the complaint from a date determined by such judge to be fair but in no event prior to the filing of the complaint.

In this case, the trial court commenced interest on October 26, 1992 which was the date of the filing of the Second Amended Complaint. Eight percent is specifically referenced in Miss. Code Ann. § 75-17-1(1) (1991).

¶75. An award of prejudgment interest is normally left in the discretion of the trial judge. ***Warwick v. Matheney,*** 603 So. 2d 330, 342 (Miss. 1992). We find that the trial court did not err in assessing interest at 8% commencing on October 26, 1992.

## CONCLUSION

¶76. We hold that the award of compensatory damages in the amount of $56,100 is reversed and rendered. The awards of $650 in compensatory damages and $300,000 in punitive damages are affirmed. We find all other assignments of error to be meritless.

¶77. **AFFIRMED IN PART; REVERSED AND RENDERED IN PART.**

**PRATHER, C.J., SULLIVAN, P.J. AND WALLER, J., CONCUR. SMITH, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY BANKS AND ROBERTS, JJ. McRAE AND MILLS, JJ., NOT PARTICIPATING.**


**SMITH, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**


¶78. I agree with the majority on all issues with the exception of the reversal of the jury verdict of $56,750.00 compensatory damages. The majority opines that the only proof offered to support this verdict concerned only Super D's loss of gross profit and that this proof is insufficient to support the jury's verdict. I believe that the plaintiff offered sufficient proof and accordingly dissent.

¶79. Super D presented its proof regarding lost profits, by expert testimony from Jerry Pardue and Henry Beattie who testified concerning the quantum of damages. Pardue testified utilizing three separate theories to support his estimates of damages. The pre/post comparison method yielded a

one-year total sales loss of $224,857 in the year following Fred's use of the customer list. His second theory compared the customer lists of those who left Super D to trade with Fred's and the dollar impact their loss actually caused Super D. Pardue testified that the prescription losses amounted to $25,000.00 for the first six months, or a total of $50,000.00 for that year. Pardue also used the account analysis theory regarding overall prescription sales together with over the counter sales which amounted to a loss of $902,832.

¶80. Henry Beattie, an expert witness concerning drug store evaluations, testified, utilizing the operating cash flow analysis, as to the net value of Super D's pre/post loss of its customer list. The majority acknowledges that, "Beattie also testified to net income loss from the operating statement of the Oxford store," but disregards that testimony in ultimately reversing and rendering on the issue of failure to support the jury verdict of net damages of $56,750.00. *Majority* at 25.

¶81. Given the jury verdict of $56,750.00, it is obvious that the jury accepted Pardue's customer comparison approach and believed that Super D was only entitled to prescription sales losses which Pardue suggested totaled $50,000.00 for the year following the loss of its customer list to Fred's. Considering the foregoing factors, coupled with Beattie's testimony dealing with net value of Super D's pre/post loss, the jury was hardly misled. Fred's more than adequately cross-examined these experts extensively probing operating costs, expenses and other aspects of the proof concerning Super D's damages, if any. The issue was properly presented, the proof of damages was sufficient, and the verdict of the jury was more than adequately supported by such proof.

¶82. Frankly, Fred's is indeed fortunate that the punitive damage verdict of $300,000.00 was not higher. Fred's corporate representatives claimed that they "became concerned" about their possession of the customer list and therefore directed that it be destroyed. Fred's deliberate shredding of Super D's original customer list could have easily been viewed by the jury as a deliberate attempt to conceal evidence of Fred's participation with Broome. The jury was thus presented sufficient evidence of theft of Super D's list, use of the list by Fred's which obviously resulted in financial benefits to Fred's and loss thereof to Super D, and destruction of the evidence by Fred's which linked Fred's to the stolen list. And then, on appeal to this Court, Fred's challenges the $650.00 jury verdict resulting from cost to Super D of reproducing that list. Such argument is preposterous.

¶83. The proof offered by the plaintiff in this record is more than sufficient to support all three monetary awards of the jury. Unless this Court finds that no reasonable jury could have assessed and awarded damages based on the trial evidence, it is powerless to disturb the verdict. ***Junior Food Stores, Inc. v. Rice***, 671 So. 2d 67, 77 (Miss. 1996).

¶84. I respectfully concur in part and dissent in part.

**BANKS AND ROBERTS, JJ., JOIN THIS OPINION.**