[No. B027238. Second Dist., Div. Seven. Aug. 15, 1990.]

COURTESY TEMPORARY SERVICE, INC., Plaintiff and Appellant, v.
LEONEL CAMACHO et al., Defendants and Appellants.

COUNSEL

Thomas M. Regele for Plaintiff and Appellant.

Arthur H. Lampel for Defendants and Appellants.

**OPINION**

**WOODS (Fred), J.—**

## I.

### INTRODUCTION

This is an appeal by Courtesy Temporary Service, Inc., hereinafter "Courtesy," from an order of the Los Angeles Superior Court partially denying Courtesy's motion for a preliminary injunction to restrain Leonel Camacho, Maria Camacho, and Bianca Alvarez, former employees of Courtesy, hereafter "Employees," from soliciting Courtesy's customers and/or utilizing or disclosing certain confidential proprietary information concerning such customers.

## II.

### CONTENTIONS

Courtesy contends that while in Courtesy's employ, Employees misappropriated Courtesy's confidential customer list, including such information as the volume of the customer's business, specific customer requirements, key managerial customer contacts and billing rates for use in Employees' competing business. Courtesy contends that Employees used such information to solicit, pirate and deceive Courtesy's customers, subjecting Courtesy to a substantial loss of business, all in violation of the law of the State of California against unfair competition, entitling Courtesy to injunctions and damages.

Employees contend that customer lists of temporary help agencies are not protected trade secrets, the court correctly determined that Employees could not be enjoined from contacting or dealing with Courtesy's customers, and that substantial evidence supports the finding that Courtesy's customers were developed from public sources.

As hereafter discussed we resolve all contentions against Employees, as being unmeritorious, and in favor of Courtesy.

## III.

### Factual and Procedural Synopsis

A. *Facts*

Courtesy is a California corporation with four branch offices, one of which is located in Hacienda Heights, California. Courtesy is in the temporary employment business, providing temporary workers to various companies, primarily factories, warehouses and light industrial concerns, according to their specific needs. Courtesy actively recruits, interviews and hires people as its own employees and then assigns these employees to its customer companies requesting assistance. Courtesy maintains the employer-employee relationship and is therefore responsible for paying these employees.

Since its inception in 1969, Courtesy has expended a great deal of time, money and effort developing and servicing its clientele and recruiting its labor force. Courtesy employs a permanent sales force to seek out and secure new business and service Courtesy's established business. Courtesy supports its sales staff with print advertising, entertainment expense accounts and promotional gifts and items. As a result, Courtesy has been successful in developing and maintaining an advantageous, stable and continuous customer base.

In the course of its dealings with its customers, Courtesy became knowledgeable and experienced in its customers' operations and developed sophisticated customer information such as the key contacts within the customer's business, special needs and customer characteristics, workers' compensation information, billing rates, profit margins and other financial information. All of this information was the product of substantial time and expense, not generally known to the public nor readily ascertainable in the temporary employment industry. A list of Courtesy's customers, who have demonstrated their willingness to use temporary employees, is not available in a trade or public directory or any other source. In short, there is no source to determine which particular businesses might be seeking or utilizing temporary employees. Rather, Courtesy's customer names, specialized requirements and patronage were secured by screening a large number of such prospects, at considerable time, effort and expense to Courtesy.

Courtesy employs branch managers and personnel supervisors for each of its branch offices. A branch manager's duties include servicing customer accounts and soliciting new business. A personnel supervisor's duties consist of interviewing and screening employee applicants, filling customer job orders and distributing payroll checks to the employees.

Defendant Leonel Camacho had been employed by Courtesy as its Hacienda Heights branch manager and sales representative for a total period of nine years until he quit on December 1, 1986, to open a competing business, Transworld Temporaries. Defendant Maria Camacho and Bianca Alvarez had been employed by Courtesy as personnel supervisors in the Hacienda Heights office for approximately six years and two years, respectively, until they quit to join Leonel Camacho at Transworld Temporaries. While in Courtesy's employ, Employees were paid a monthly commission based upon a percentage of the branch office's net monthly sales, in addition to their base salaries.

As part of their duties as branch manager and sales representative and personnel supervisors, respectively, Employees developed familiarity and friendly contacts with Courtesy's customers and employees. In order that Employees might effectively carry out their employment duties, Courtesy necessarily revealed to Employees confidential and proprietary information regarding Courtesy's customers, including their sales volume, profit margins, special employment needs, particular likes and dislikes and pay rates and markups. Similarly, in the course of their employment at Courtesy, Employees necessarily acquired confidential knowledge regarding Courtesy's employees/labor force, including their names, addresses, job skills, past employment history and employment record with Courtesy's customers. At all times, Employees were aware of the confidential nature of this information and of Courtesy's reasonable efforts to ensure its secrecy.

By November 1986, and while still in Courtesy's employ, Employees admittedly planned the formation of a competing temporary employment business, Transworld Temporaries, and the transfer of all of Courtesy's preferred customers serviced by Employees to such competing business. Employees were keenly aware that Courtesy's long-standing, preferred customers would want to keep Courtesy's present temporary employees in their businesses because of their training and experience over the course of extended job assignments. Thus, Employees knew that the quickest and most effective way to appropriate Courtesy's more lucrative accounts and simultaneously establish their own labor force, was to pirate Courtesy's employees.

In furtherance of this scheme, in November 1986, while still employed at Courtesy, Employees began soliciting Courtesy's employees to join them in their soon-to-be-open competing business. Employees admittedly wrote and published a letter to Courtesy's customers and employees thanking them for their patronage, stating that their "*continual* support and cooperation" obliged Employees to "*further* improve," and asking them to "accept the best [Employees] have to offer from [their] *new location.*" The "new

location" was the address of Employees' competing business, Transworld Temporaries. Employees' statements were intended, and were in fact understood by those who read them, to refer to Courtesy, implying that Courtesy had either relocated or was being taken over by Transworld Temporaries. When Courtesy's employees came into the Hacienda Heights office during the last week of November 1986 to pick up their weekly payroll checks, Employees handed this letter to such employees and directed them to pick up their paychecks at the new address in the future.

Employees were equally intent upon diverting all of Courtesy's preferred and valuable customers' business to Transworld Temporaries. During the course of his deposition, Camacho produced a document which he testified was a customer list which he prepared and used to solicit business for his new company. The first two pages of this list contain the names of all of Courtesy's major customers. In each instance, for a Courtesy customer, the list contains a person to contact in such company for temporary personnel needs. Employees admitted that this list was prepared while still in Courtesy's employ and that the names and information concerning Courtesy's customers on such list were obtained through Employees' employment at Courtesy. Employees' list also includes billing rates and/or markup percentages for Courtesy's customers and only Courtesy's customers. With one exception, Camacho admitted that he solicited the business of all of Courtesy's customers on behalf of Transworld Temporaries prior to Employees' leaving Courtesy's employ. In each such instance of solicitation, Employees admittedly utilized the confidential customer information acquired by Employees while in Courtesy's employ.

Immediately after resigning from Courtesy's employ, Employees obtained payroll information concerning Courtesy's employees for the week ended November 30, 1986, from Courtesy's preferred customers. Employees fully intended to use such payroll information to remunerate Courtesy's employees through their competing business, Transworld Temporaries, and thereafter bill Courtesy's customers for such temporary services.

Finally, utilizing Courtesy's confidential and proprietary information regarding the amount of business transacted by and between said customers and Courtesy, and Courtesy's mark up of these various accounts, Employees have solicited all of Courtesy's more valuable and preferred customers.

Courtesy's advantageous business relations with its customers are threatened to be, and have been, disrupted in that certain preferred customers have begun to use the services of Employees. Combined, Courtesy's subject customers account for nearly $1.5 million in annual sales. Courtesy's sales were immediately decreased by approximately 60 percent by Employees'

tactics. Although Employees claim to have solicited business from approximately 150 firms, at the end of their first month of business, Employees' new agency claimed only one customer which had not been a customer of Courtesy.

## B. *Procedural History*

On December 16, 1986, Courtesy filed its complaint for injunctive relief and money damages for: (1) unfair competition and misappropriation of trade secrets—violation of California Civil Code[1] section 3426 et seq.; (2) violation of California Business and Professions Code section 17200 et seq.; (3) tortious interference with prospective economic advantage; (4) breach of confidential relationship; (5) breach of implied covenant of good faith and fair dealing; and (6) libel/business disparagement. Courtesy simultaneously applied for a temporary restraining order and order to show cause re preliminary injunction, enjoining defendants from (1) soliciting any customers of Courtesy serviced by Employees when employed at Courtesy; (2) soliciting or employing Courtesy's specified temporary labor force employees; and (3) utilizing or disclosing any confidential Courtesy customer information. The Honorable Robert Weil issued the temporary restraining order as requested.

The preliminary injunction hearing took place on March 2, 1987, the Honorable Jerry Fields, judge presiding. At the hearing, the court found, based upon the evidence, that Employees had acted deceitfully, that they had stolen Courtesy's customers and employees and had even attempted to steal Courtesy's money. The court issued a preliminary injunction restraining Employees from soliciting or utilizing Courtesy's employees. However, despite having found Employees' acts to be "abhorrent" and "detestable" the trial court felt itself precluded by *American Paper & Packaging Products, Inc.* v. *Kirgan* (1986) 183 Cal.App.3d 1318 [228 Cal.Rptr. 713] from enjoining Employees' stealing of Courtesy's confidential customer list and related information and held such list to be unprotectable work product. This appeal and cross-appeal followed.

## IV.

### DISCUSSION

The trial court correctly found that Courtesy's customer list and related information are trade secrets in light of all of the circumstances before it. The trial court erred, however, in failing to correctly interpret and apply the

---

[1] Unless otherwise noted, all references are to the Civil Code.

law. First, the court erred in relying upon *American Paper* in concluding that Courtesy's customer list and information do not constitute protectable trade secrets under section 3426 et seq. Second, *American Paper* is distinguishable from the facts in this case. Third, *American Paper* misconstrued California's trade secret statute and its legislative intent, and we decline to rely on the decision in this case. Finally, the court erred in not granting the requested injunctive relief under Business and Professions Code section 17200 et seq., a separate ground espoused by Courtesy.

A. *The trial court's order, partially refusing Courtesy's requested preliminary injunction, is directly appealable.*

■ All orders granting or refusing either a temporary restraining order or a preliminary injunction are directly appealable. (Code Civ. Proc., § 904.1, subd. (f).)

B. *The trial court erred in finding that Courtesy's customer list and related information stolen by Employees did not constitute protectable trade secrets under the authority of "American Paper" and the Uniform Trade Secrets Act.*

At the preliminary injunction hearing, the trial court sarcastically found that Camacho represented the "American way" by being a "small person who saved his money and went into business on his own in an attempt to make a life for himself and his wife by *stealing, lying and cheating.* " (Italics added.) The court labelled this the "worst case" wherein employees have been shown to be "deceitful," specifically finding that Employees stole Courtesy's customers. Despite these findings, the lower court felt itself precluded by *American Paper & Packaging Products, Inc.* v. *Kirgan, supra,* 183 Cal.App.3d 1318, from enjoining Employees' misappropriation of Courtesy's customer list and related proprietary information. However, neither *American Paper* nor the Uniform Trade Secrets Act (UTSA), section 3426 et seq., compels this result. This case involves a clear factual scenario of a customer list and related information constituting protectable trade secrets.

1. *Courtesy's customer list and related information satisfy the definition of trade secret contained in the Uniform Trade Secrets Act.*

■ Effective January 1, 1985, California adopted the Uniform Trade Secrets Act (§§ 3426-3426.10) for misappropriation of trade secrets. It defines a trade secret as "information, including a formula, pattern, compilation, program, device, method, technique, or process, that: [¶] (1) Derives independent economic value, actual or potential, from not being generally

known to the public or to other persons who can obtain economic value from its disclosure or use; and [¶] (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." (§ 3426.1, subd. (d).)

Measured by this two-prong test, the facts in the instant case conclusively establish that Courtesy's customer list and related information are protectable trade secrets. The legislative intent and better reasoned cases, which the Uniform Trade Secrets Act is meant to codify, establish that a customer list procured by substantial time, effort, and expense is a protectable trade secret.

The UTSA's definition of a " 'trade secret' contains a reasonable departure from the Restatement of Torts (First) definition which required that a trade secret be 'continuously used in one's business.' *The broader definition in the proposed Act . . . includes information that has commercial value from a negative viewpoint, for example the results of lengthy and expensive research which proves that a certain process will *not* work could be of great value to a competitor." (Italics added and original italics.) (See legis. committee com., 12 West's Ann. Civ. Code, § 3426.1 (1990 pocket supp.) p. 108.)

The compilation by Courtesy of its list of customers was the result of lengthy and expensive efforts, including advertising, promotional campaigns, canvassing, and client entertainment. The court below, however, ruled that such "work effort" of Courtesy in compiling its customer list was "not any secret" entitled to protection and, on such erroneous basis, denied the injunction as to Courtesy's customer list. Contrary to the court's ruling, it is this very "work effort," or process of acquiring and retaining clientele, that constitutes a protectable trade secret.

A list of customers or subscribers "built up by ingenuity, time, labor and expense of the owner over a period of many years is property of the employer," and " '[k]nowledge of such a list, acquired by an employee by reason of his employment, may not be used by the employee as his own property or to his employer's prejudice.' " (*Greenly* v. *Cooper* (1978) 77 Cal.App.3d 382, 392 [143 Cal.Rptr. 514].) Employees, by appropriating only those customers who, after Courtesy's efforts, chose to patronize Courtesy and saving themselves comparable efforts in screening those entities who declined Courtesy's patronage, have acquired commercially invaluable information.

This concept of "negative" research was emphasized in the case of *Hollingsworth Solderless Terminal Co.* v. *Turley* (9th Cir. 1980) 622 F.2d 1324. If a customer list is acquired by lengthy and expensive efforts which, from a

negative viewpoint, indicate those entities that have *not* subscribed to plaintiff's services, it deserves protection as a "trade secret" under the act. According to *Hollingsworth*, even if the customers' names could be found in telephone or trade directories, such public sources " 'would not disclose the persons who ultimately made up the list of plaintiff's customers.' " (*Id*. at p. 1333.) It is the list of persons who actually purchase Courtesy's services that constitute confidential information.

Here, the evidence established that Courtesy's customer list and related information was the product of a substantial amount of time, expense and effort on the part of Courtesy. Moreover, the nature and character of the subject customer information, i.e., billing rates, key contacts, specialized requirements and markup rates, is sophisticated information and irrefutably of commercial value and not readily ascertainable to other competitors. Thus, Courtesy's customer list and related proprietary information satisfy the first prong of the definition of "trade secret" under section 3426.1.

2. *Courtesy's efforts to maintain the confidentiality of its customer list satisfy UTSA's definition of trade secret.*

Courtesy's customer list also satisfies the second prong of the UTSA definition of "trade secret" in that it has been "the subject of efforts that are reasonable under the circumstances to maintain its secrecy." (§ 3426.1, subd. (d)(2).) "[R]easonable efforts to maintain secrecy have been held to include advising employees of the existence of a trade secret, limiting access to a trade secret on 'need to know basis,' and controlling plant access." (See legis. committee com., 12 West's Ann. Civ. Code (1990 pocket supp.) p. 108.)

The unrefuted evidence in this case is that information regarding Courtesy's customers is not divulged to any persons outside the business. It is Courtesy's policy to divulge such confidential and proprietary information to its branch office employees, such as Employees, only as is necessary for them to effectively carry out their specific duties. The sales, customer and employee information for one branch office is not generally revealed to any other branch employees. As to any information revealed to such employees, the employees are told of the confidential and proprietary nature of such information. Access to such customer information was divulged to Employees only on an "as needed basis" to perform their duties and was limited to the branch office wherein Employees exclusively worked. Furthermore, Employees were advised of its confidentiality. These efforts satisfy the secrecy requirement of section 3426.1, subdivision (d)(2), and thus the customer list constitutes a "trade secret."

3. *The trial court erred in holding that American Paper precluded it from finding that Courtesy's customer list and related information are protectable trade secrets.*

In denying Courtesy's requested injunction of Employees' use of Courtesy's customer list and related information, the lower court reasoned that the case of *American Paper & Packaging Products, Inc.* v. *Kirgan, supra*, 183 Cal.App.3d 1318, mandated the conclusion that Courtesy's customer information was not a protectable trade secret. A careful reading and analysis of *American Paper* reveals that it is factually inapposite to the instant case. *American Paper* held that customer lists can be protectable trade secrets under the UTSA, but that information generally known in the trade and already used by good faith competitors "is not a protectable trade secret and injunction should not issue." (*Id.* at p. 1326.) The *American Paper* court concluded that the plaintiff, a packing concern, had not presented sufficient evidence providing that its customer list was a trade secret and that names of manufacturer customers who require shipping supplies, while they may not be generally known to the public, would be readily ascertainable to other persons in the shipping business. (*Ibid.*) The compilation process that plaintiff had used was found to be "neither sophisticated nor difficult nor particularly time consuming." (*Ibid.*)

In *American Paper*, defendants, shortly after leaving plaintiff's employ, began working as salespersons for a competitor of plaintiff. Although plaintiff had alleged that its customer information was obtained by defendants from its records and files which had been provided to them prior to their termination, defendants denied that they were given information on any actual or potential customers by plaintiff. They alleged that any such customer lists were developed as "fruit of their own labor" by visiting industrial-zoned communities in their sales area, locating and compiling lists of manufacturing companies, making cold calls on such companies, and consulting phone directories. (183 Cal.App.3d at p. 1321.)

Contrary to the disputed testimony that defendants were given confidential information in *American Paper*, the record herein overwhelmingly supports a finding that Employees, using Courtesy's customer lists, payroll records, and billing rates, intentionally solicited Courtesy's customers while still in Courtesy's employ. Employees terminated their employment with Courtesy on December 1, 1986, and were operating their own competing business on the same day. Within two weeks of operation without any visits to industrial-zoned communities, canvassing, or "cold calls," Employees had misappropriated 60 percent of Courtesy's customers.

Whereas plaintiff in *American Paper* had proferred no evidence as to the efforts it expended in compiling its customer list or in maintaining its

secrecy, Courtesy, in the instant case, has detailed the substantial efforts it expended in acquiring its customers, including years of promotional and advertising campaigns. Whereas defendants in *American Paper* denied having been given any confidential customer information, Employees admitted having used Courtesy's customer lists and financial information to deliberately solicit Courtesy's customers while employed by Courtesy.

In his declaration in opposition to Courtesy's motion for preliminary injunction, Camacho admitted that he "jumped the gun" in soliciting Courtesy's customers while still employed by Courtesy. Camacho admitted having a list of potential clients, which included Courtesy's clients, and that he prepared the list from Courtesy's personnel roster a couple of weeks prior to leaving Courtesy. He further testified that while employed by Courtesy, he had sent "proposal" packages to Courtesy's customers whose names he obtained from Courtesy's "payroll printout." Rather than merely announcing the opening of his own business, almost two weeks prior to the opening of his business, Camacho asked Courtesy's preferred customer, Plastron, about getting temporary employment business from them. Camacho admitted that he had submitted a proposal to Plastron. While still employed by Courtesy, Camacho submitted similar proposals to Courtesy's better customers, including Nutro Products, Lights of America, County Sanitation District, and Industry Deburring, among others.

Another "improper" method used by Employees to divert Courtesy's customers was to convert payroll records of various customers to Employees' own use. Camacho admitted to having requested and obtained from Courtesy's customers, after terminating his employment, weekly payroll reports of Courtesy's temporary employees for the week ending November 30, 1986, with the intent to "run a payroll" through his new agency, Transworld Temporaries, and to "pay [Courtesy's] employees for that work week through Transworld Temporaries."

Employees' solicitation has nourished their new enterprise. As of the end of December 1986, Transworld Temporaries had only invoiced one client that had not been a preferred customer of Courtesy. Such evidence supports the conclusion that Employees, unlike defendants in *American Paper*, did not acquire Courtesy's customers by "the fruit of their own labor" or through public sources, but rather they expended scant efforts of their own, and unfairly relied upon the efforts expended by Courtesy in compiling its customer list and related commercially valuable and not easily discovered information. The evidence further supports the conclusion that Employees, while still employed by Courtesy, used confidential customer information to not merely announce formation of their new business, but to actively solicit Courtesy's customers in a successful attempt to injure Courtesy by diverting

those customers to Employees' competing business. Such conduct, which was not shown in *American Paper*, is enjoinable as a patently unfair trade practice under the UTSA.

In summary, considering the admitted misappropriation of sophisticated, detailed customer information and active solicitation by Employees in the instant case, as contrasted with the independent efforts of the former employees and innocuous and readily ascertainable information at issue in *American Paper*, the trial court's refusal to grant injunctive relief was an abuse of discretion.

C. *The trial court erred in not enjoining Employees' unfair business practices under Business and Professions Code section 17200 et seq.*

■  Finally, the court below erred in relying exclusively on section 3426 et seq. and *American Paper*'s construction of that statute to deny Courtesy's claim under Business and Professions Code section 17200 et seq. The UTSA, specifically section 3426.7, subdivision (a), expressly provides that the Act "does not supersede any statute relating to misappropriation of a trade secret, or any statute otherwise regulating trade secrets." Thus, even if Courtesy's customer list would not qualify as a "trade secret" under section 3426.1, the unfair and deceptive practices of employees in stealing Courtesy's customers should have been enjoined under Business and Professions Code section 17200 et seq.

In its complaint, Courtesy stated a cause of action under Business and Professions Code section 17200 for unfair competition, requesting injunctive relief and alleging, among other things, that by Employees' solicitation, piracy and deceit of Courtesy's customers, Courtesy was irreparably injured in its identity, reputation and goodwill, causing the loss of valuable customers, employees, and profits and threatening the complete destruction of its business.

Business and Professions Code section 17200 provides: "As used in this chapter, unfair competition shall mean and include unlawful, unfair or fraudulent business practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code." Business and Professions Code section 17203 provides for injunctive relief against "[a]ny person performing or proposing to perform an act of unfair competition within this state."

In *Klamath-Orleans Lumber, Inc.* v. *Miller* (1978) 87 Cal.App.3d 458 [151 Cal.Rptr. 118], the court upheld a permanent injunction restraining

two former employees from soliciting their former employer's customers. Plaintiff, a manufacturer of load binders, had compiled a confidential customer list that contained such information as the creditworthiness and purchasing habits of each customer, and the defendants, the plaintiff's shop and office managers, had left plaintiff's employ to organize their own competing business and had written up plaintiff's customer lists from memory. The defendants then mailed advertising brochures to plaintiff's customers.

The court held that the defendants' actions constituted a breach of trust and misappropriation of confidential information. There was "substantial evidence to support the trial court's determination that plaintiff's knowledge was confidential and deserving of protection, and that defendants' ability to solicit both more selectively and more effectively was due to their extensive use of plaintiff's customer list—a patent act of unfair competition." (87 Cal.App.3d at p. 466.) Indeed, the cases are legion holding that a former employee's use of confidential information obtained from his former employer to compete with him and to solicit the business of his former employer's customers, is regarded as unfair competition. (See, e.g., *Greenly* v. *Cooper, supra,* 77 Cal.App.3d 382, 391-392.)

## V.

### DISPOSITION

That portion of the order of the court denying Courtesy's petition for preliminary injunction against Employees from using Courtesy's confidential customer list and related information is reversed with directions to enter a new and different preliminary injunction in accordance with this opinion. In all other respects the judgment below is affirmed and the cross-appeal is dismissed. Costs on appeal are awarded to appellant Courtesy.

Lillie, P. J., and Johnson, J., concurred.