[No. E033651. Fourth Dist., Div. Two. Feb. 14, 2005.]

READYLINK HEALTHCARE, Plaintiff and Respondent, v.
JEROME COTTON, Defendant and Appellant.

## COUNSEL

David Justin Lynch & Associates and David Justin Lynch for Defendant and Appellant.

Lewis Brisbois Bisgaard & Smith, Roy G. Weatherup, David N. Makous and Eric J. Erickson for Plaintiff and Respondent.

## OPINION

**GAUT, J.**—Defendant Jerome Cotton appeals from the trial court's order issuing a preliminary injunction in favor of his former employer, plaintiff ReadyLink Healthcare (ReadyLink). The preliminary injunction contains paragraphs "a" and "b." Paragraph "a" enjoins Cotton from soliciting ReadyLink employees and customers, including ReadyLink's agents, nurses, remote recruiters, hospitals, and other healthcare facilities and professionals under contract with ReadyLink. Paragraph "b" enjoins Cotton from using or disclosing ReadyLink trade secrets or other confidential information Cotton took or received from ReadyLink. Paragraph "b" lists numerous items as protectable trade secret items.

Cotton contends the trial court abused its discretion in issuing the preliminary injunction because ReadyLink is not likely to prevail on its claims and failed to establish it would suffer irreparable harm in the absence of the injunction. Cotton also claims the injunction should have been denied because it is premised on an unenforceable clause. In addition, Cotton argues many of the enjoined items are not trade secrets and the injunction language is vague and ambiguous.

Since Cotton only appealed paragraph "a" of the injunction, we address only those challenges pertaining to that portion of the injunction. We conclude there was no abuse of discretion enjoining the conduct specified in paragraph "a." Regardless of the enforceability of the noncompetition agreements, there is sufficient evidence establishing that Cotton misappropriated trade secrets; there remained an imminent threat of him using the trade secret information to solicit ReadyLink's employees and customers; and ReadyLink likely would suffer irreparable harm unless the injunction was granted. Under such circumstances, the injunction was proper. We also reject Cotton's contention paragraph "a" of the preliminary injunction is vague and ambiguous, with the exception of certain language in the injunction which is overly broad and ambiguous and thus must be stricken.

### 1. Factual and Procedural Background

ReadyLink is a licensed healthcare service provider, with a nurse staffing division which provides healthcare facilities and professionals with nurses. ReadyLink recruits, interviews, and hires nurses as its own employees and then assigns them to its customer healthcare providers who request nurses. The nurses are recruited by ReadyLink's agents and remote recruiters, and are normally under contract with ReadyLink for a three month period. ReadyLink is responsible for paying its nurses according to the compensation terms agreed to in the nurses' employment contracts with ReadyLink. ReadyLink provides its nurses with benefits and workers' compensation and malpractice coverage.

ReadyLink enters into separate contracts with its healthcare provider customers wherein the customers agree to pay ReadyLink a specified fee for ReadyLink providing them with nurses. ReadyLink uses a portion of that fee to pay its nurses and retains the remainder.

According to the declaration of Elizabeth Ann Watts, executive vice-president of ReadyLink's corporate division, and Cotton's former supervisor, ReadyLink has invested a great deal of time, money, and effort developing its database of nurses and healthcare provider customers. This information is used to recruit nurses and service its clientele. The databases "have economic

value because they are the result of extensive expenditures of time, effort and money, and the materials contain information not generally known within the trade, and the materials represent substantial research and compilation of existing and prospective customer data, as well as existing and prospective client nurse data. . . . READYLINK paid and invested tens of thousands of dollars in procuring these lists and rendering them useful, and READYLINK invested a great deal of employee time in developing and making these lists useful, . . . The financial and compensation plan information are plans developed and created by READYLINK at significant costs and time and they involve numerous confidential documents and these innovative programs are unique in the industry and give READYLINK a competitive advantage." One such plan ReadyLink developed is a unique compensation plan referred to as the "Per Diem Program," which nurses tend to favor over competitors' compensation plans.

In her supplemental declaration, Watts further states that the value of various enumerated proprietary and confidential items is "extraordinary. Developing an ongoing database and its maintenance is the lifeblood of ReadyLink's entire business. The company employs hundreds of full time employees to maintain and develop our data base. ReadyLink has invested very heavily in the development of our systems and files, education programs, special e-systems to give us an edge in the competition. . . . [¶] . . . [¶] From the first day of business ReadyLink actively recruited employees, building an electronic database on each employee that must be continually updated and managed just as any employee database would be. This endeavor has been very costly. ReadyLink has a workforce of over 100 people in the office working on the development and maintenance of that database and mobile work force." This information, according to Watts, is not generally known to the public or ReadyLink competitors.

ReadyLink employs a sales force to recruit nurses, secure new business, and service existing customers. In July 2000, ReadyLink hired Cotton. In September 2000, Cotton signed an employment agreement and "Employee Confidentiality, Non-Disclosure and Non-Circumvention Agreement" pertaining to maintaining confidentiality and nondisclosure of ReadyLink's proprietary information, including ReadyLink trade secrets.

In section 4 of the employment agreement Cotton agreed not to "directly or indirectly, hire, provide information to others who may want to hire, solicit, or encourage to leave, any employee, consultant, client, agent, independent contractor, or contractor of ReadyLink" for three years after termination of Cotton's employment. Cotton also agreed not to "accept employment with any Client or Client Facility to which (s)he may have worked with or for, or

have been assigned while an employee of ReadyLink without the prior written approval of ReadyLink" for three years after termination of Cotton's employment.

In January 2001, Cotton became a ReadyLink nurse recruiting agent. Cotton signed an agent agreement and another "Proprietary & Confidential Information, Non-Disclosure, Non-Circumvention Agreement." The agreement stated in detail proprietary information that Cotton was prohibited from disclosing, including those items listed in paragraph "b" of the preliminary injunction. It also contained a section stating that in order to forestall disclosure of proprietary information, upon Cotton's termination, he was prohibited for three years thereafter from soliciting ReadyLink employees or customers; attempting to divert business from ReadyLink; and engaging in any business in competition with ReadyLink business.

On March 8, 2002, ReadyLink fired Cotton for stealing ReadyLink records containing proprietary and confidential information. Cotton authorized a search of his residence and storage locker. During the search, the police recovered one or two boxes of stolen ReadyLink documents. Cotton was also caught, while employed at ReadyLink, on videotape entering ReadyLink private offices late at night and copying payroll practices, confidential documents, and notes. Although the police investigated the theft, Cotton was not prosecuted.

Upon termination of his employment, Cotton signed a declaration acknowledging misappropriation and improper use of ReadyLink confidential and proprietary information; attempting to form his own company in competition with ReadyLink; and improperly soliciting ReadyLink employees to staff his company and investors for his new company.

Despite agreeing in his declaration not to become employed at any other healthcare staffing company, he began working at a ReadyLink competitor, Registry Network, two weeks after his termination at ReadyLink.

In April 2002, ReadyLink sued Cotton and his new employer, Registry Network, for violating the Uniform Trade Secrets Act (UTSA) (Civ. Code, § 3426 et seq.), unfair competition, intentional interference with economic relations, tortious interference with prospective business advantage, breach of contract, and defamation. ReadyLink requested injunctive relief, as well as damages prohibiting Cotton from disclosing ReadyLink proprietary information to Registry Network and soliciting ReadyLink employees and customers. ReadyLink alleged Cotton stole confidential and proprietary information concerning ReadyLink's finances, clients, employee contacts, payroll practices, and business methodology.

In April 2002, after ReadyLink notified Registry Network of Cotton's theft of ReadyLink confidential and proprietary information, Cotton's employment at Registry Network terminated.

In April 2002, shortly after filing its lawsuit, ReadyLink requested a temporary restraining order and preliminary injunction. In July 2002, the court granted ReadyLink a preliminary injunction but, since the court did not order a bond posted, the preliminary injunction was deemed invalid and dissolved. In October 2002, ReadyLink again requested a preliminary injunction and for some unknown reason, which is not reflected in the record, the court denied ReadyLink injunctive relief without prejudice. In January 2003, ReadyLink again requested a preliminary injunction, which the court granted in March 2003.[1]

In the preliminary injunction, the trial court enjoined Cotton from engaging in or performing two categories of activity specified in paragraphs "a" and "b" of the order. Paragraph "a" states that Cotton shall "Cease and desist and refrain from engaging in any solicitation of READYLINK HEALTHCARE employees, or agents, nurses, or remote recruiters, or anyone under contract with READYLINK HEALTHCARE or associated with READYLINK HEALTHCARE; hospitals under contract with READYLINK HEALTH-CARE; and any other healthcare facility or healthcare professional in a business relationship with READYLINK HEALTHCARE in regard to the nurse staffing business." Paragraph "b" enjoins Cotton from "using or disclosing trade secrets or other confidential information taken or received from READYLINK HEALTHCARE in any manner." The injunction lists the enjoined trade secret items.

Cotton appealed the preliminary injunction by filing a notice of appeal expressly appealing "Paragraph (A) of the Order Granting Preliminary Injunction."

## 2. Notice of Appeal

ReadyLink argues that Cotton's appeal is limited to paragraph "a" of the preliminary injunction order. Cotton does not refute this contention in his reply brief. Cotton filed a notice of partial appeal from the order granting a preliminary injunction against Cotton. Cotton states in his notice of appeal that he is only appealing "Paragraph (A) of the Order Granting Preliminary Injunction."

---

[1] Cotton's characterization of ReadyLink as suddenly rushing into court in January 2003 to obtain injunctive relief 10 months after filing its lawsuit against Cotton is disingenuous and misleading.

■ In determining whether Cotton's appeal is limited to that portion of the preliminary injunction specified in the notice of appeal, we must first determine whether the specified portion is severable: "The well recognized rule is that there may be an appeal from a part of a judgment only if that part is severable. [Citations.] Where portions of a judgment are truly severable, the appellate court is without jurisdiction to consider the parts from which no appeal has been taken. [Citations.] And the appellate court will consider the portion before it independently of the other parts. [Citations.] Modification or reversal of the portion of the judgment from which the appeal has been taken has no effect upon the other portions. [Citations.]" (*American Enterprise, Inc. v. Van Winkle* (1952) 39 Cal.2d 210, 216–217 [246 P.2d 935]; see also *Gonzales v. R. J. Novick Constr. Co.* (1978) 20 Cal.3d 798, 806 [144 Cal.Rptr. 408, 575 P.2d 1190].)

■ As explained in *Gonzales v. R. J. Novick Constr. Co., supra,* 20 Cal.3d at pp. 804–805, " 'Ordinarily [an appeal from a specific portion of a judgment] would leave the parts not appealed from unaffected, and it would logically follow that such unaffected parts must be deemed final, being a final judgment of the facts and rights which they determine. . . . [T]he court upon such partial appeal can inquire only with respect to the portion appealed from.' " (*Ibid*, quoting *Whalen v. Smith* (1912) 163 Cal. 360, 362–363 [125 P. 904].)

Paragraph "a" of the preliminary injunction order enjoins Cotton from soliciting ReadyLink employees, nurses, healthcare providers, and others under contract with ReadyLink. Although Cotton filed a partial appeal limiting his appeal to paragraph "a," in his opening appellant's brief Cotton challenges not only paragraph "a" but also paragraph "b" of the order. Since Cotton only appealed paragraph "a" of the injunction, this court lacks jurisdiction to consider Cotton's challenge to paragraph "b" enjoining the use or disclosure of trade secrets. Paragraph "b" is "not so intimately connected with the part appealed from that a reversal of that part would require a reconsideration of the whole case in the court below." (*Gonzales v. R. J. Novick Constr. Co., supra,* 20 Cal.3d at p. 805, quoting *Whalen v. Smith, supra,* 163 Cal. at pp. 362–363.)

■ As a consequence, we apply " 'the general principle that an appeal from a distinct and independent part of a judgment does not bring up the other parts for review in the appellate court.' " (*Gonzales v. R. J. Novick Constr. Co.. supra,* 20 Cal.3d at p. 805, quoting *Whalen v. Smith, supra,* 163 Cal. at pp. 363–364.) This opinion is thus limited to review of paragraph "a" of the preliminary injunction order and paragraph "b" will stand as a final adjudication.

### 3. Injunctive Relief

Cotton contends the trial court abused its discretion granting ReadyLink a preliminary injunction. He claims there is insufficient evidence that ReadyLink will prevail on the merits and suffer irreparable harm in the absence of the preliminary injunction.

Since Cotton only appealed the portion of the injunction enjoining solicitation (paragraph "a"), we limit our discussion solely to the sufficiency of evidence as to paragraph "a" of the injunction concerning Cotton's solicitation of ReadyLink's employees and customers.

#### A. *Standard of Review*

■ A preliminary injunction is governed by the following principles: " 'In deciding whether to issue a preliminary injunction, a trial court weighs two interrelated factors: the likelihood the moving party ultimately will prevail on the merits, and the relative interim harm to the parties from the issuance or nonissuance of the injunction.' " (*Whyte v. Schlage Lock Co.* (2002) 101 Cal.App.4th 1443, 1449–1450 [125 Cal.Rptr.2d 277], quoting *Hunt v. Superior Court* (1999) 21 Cal.4th 984, 999 [90 Cal.Rptr.2d 236, 987 P.2d 705]; see also *American Credit Indemnity Co. v. Sacks* (1989) 213 Cal.App.3d 622, 630 [262 Cal.Rptr. 92].)

■ We apply the abuse of discretion standard of review in reviewing the lower court's order granting the preliminary injunction. " 'The law is well settled that the decision to grant a preliminary injunction rests in the sound discretion of the trial court. [Citations.] . . . [¶] A trial court will be found to have abused its discretion only when it has " 'exceeded the bounds of reason or contravened the uncontradicted evidence.' " [Citations.] Further, the burden rests with the party challenging the injunction to make a clear showing of an abuse of discretion. [Citations.]' " (*American Credit Indemnity Co. v. Sacks, supra,* 213 Cal.App.3d at pp. 629–630.) This court does not "resolve conflicts in the evidence, reweigh the evidence, or assess the credibility of witnesses. [Citation.] . . . Thus, even when presented by declaration, 'if the evidence on the application is in conflict, we must interpret the facts in the light most favorable to the prevailing party and indulge in all reasonable inferences in support of the trial court's order.' " (*Whyte v. Schlage Lock Co., supra,* 101 Cal.App.4th at p. 1450.)

## B. *The Likelihood of Prevailing*

■ Cotton argues ReadyLink is not likely to prevail on the merits because ReadyLink is seeking permanent injunctive relief based on an illegal covenant not to compete and on ReadyLink items that are not protectable trade secrets. We disagree: "While it has been legally recognized that a former employee may use general knowledge, skill, and experience acquired in his or her former employment in competition with a former employer, the former employee may not use confidential information or trade secrets in doing so." (*Morlife, Inc. v. Perry*(1997) 56 Cal.App.4th 1514, 1519 [66 Cal.Rptr.2d 731].) This is precisely what Cotton attempted to do and there remains the threat he will do so in the future if not enjoined. We acknowledge the important legal right of persons to engage in businesses and occupations of their choosing. However, we also recognize that, fundamental to the preservation of our free market economic system, there is "the concomitant right to have the ingenuity and industry one invests in the success of the business or occupation protected from the gratuitous use of that 'sweat-of-the-brow' by others." (*Morlife, Inc. v. Perry, supra*, 56 Cal.App.4th at p. 1520.)

■ Here, there is ample evidence supporting the trial court's finding that ReadyLink is likely to prevail on its misappropriation of trade secret claim brought under the UTSA and unfair competition claim (Bus. & Prof. Code, § 17200 et seq.).

### (1) *Trade Secrets*

■ As regards Cotton's challenge to paragraph "a," there is overwhelming evidence that in soliciting ReadyLink's employees, nurses, and healthcare provider customers, Cotton used trade secret information within the meaning of the UTSA. We note, however, "Our decision regarding trade secret status is based upon the appellate record and is not a final adjudication on the merits. [Citations.] The ultimate determination of trade secret status is subject to proof presented at trial." (*Whyte v. Schlage Lock Co., supra*, 101 Cal.App.4th at p. 1453.)

■ A trade secret, as defined in the UTSA, as "information, including a formula, pattern, compilation, program, device, method, technique, or process, that: [¶] (1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and [¶] (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." (Civ. Code, § 3426.1, subd. (d).)

■■ Civil Code section 3426.3, subdivision (a) of the UTSA allows a plaintiff to recover damages for losses caused by misappropriation of trade secrets, and Civil Code section 3426.2, subdivision (a) provides that "[a]ctual or threatened misappropriation may be enjoined." Under Civil Code section 3426.2, subdivision (c), "affirmative acts to protect a trade secret may be compelled by court order."

■■ The court may also enjoin the use or disclosure of trade secrets under the unfair competition provisions, particularly Business and Professions Code section 17203, which provides for injunctive relief against "[a]ny person who engages, has engaged, or proposes to engage in unfair competition . . . ."[2]

In the instant case, upon Cotton's termination from ReadyLink, he admitted he misappropriated proprietary and confidential information from ReadyLink, and that disclosure of such information violated local, state, and federal law. He also admitted that as a consequence of misappropriating such information, it would not be possible for him to engage in the healthcare staffing business without indirectly or inadvertently using or disclosing such proprietary information.

The declarations supporting ReadyLink's injunction also provide overwhelming evidence that Cotton intended to start his own nurse staffing business in competition with ReadyLink, using ReadyLink's trade secret information. Before and after ReadyLink fired him, he illicitly solicited ReadyLink's employees and nurses, using ReadyLink's proprietary and confidential information, such as ReadyLink's databases containing lists of ReadyLink nurses, employees, and healthcare facility customers, compilations of compensation, employment preferences, contact information, nurse applications and tests, and ReadyLink's unique per diem program.

The supporting declarations sufficiently establish that this trade secret information has potential economic value because ReadyLink went to great expense to compile the data and the information would enable a competitor to recruit away from ReadyLink nurses and employees under contract with ReadyLink.

Furthermore, ReadyLink took reasonable steps to ensure the secrecy of its trade secret information by requesting employees to sign nondisclosure agreements. Cotton entered into two employment agreements in which he agreed not to use or disclose ReadyLink's proprietary and confidential information.

---

[2] Business and Professions Code section 17203 has been amended by initiative measure (Prop. 64, § 2, approved by voters, Gen. Elec. (Nov. 2, 2004)). The amendment relates to standing and has no impact on the instant proceeding.

We further note that, by not appealing paragraph "b" of the preliminary injunction, which enjoins the use or disclosing of ReadyLink's trade secret information, Cotton has in effect conceded these items are enjoinable trade secrets. In addition, Cotton does not argue in his appellant's opening brief or reply that each and every item enjoined in paragraph "b" is not a trade secret, thus conceding that some of the enjoined items are protectable trade secrets.

As explained in *Hollingsworth Solderless Terminal Co. v. Turley* (1980) 622 F.2d 1324, 1337–1338, "Mere solicitation of an employee, under no contract of employment, to leave and associate with a competing firm is not illegal. [Citation.] 'However, if either the defecting employee or the competitor . . . is guilty of some concomitant, unconscionable conduct, the injured former employer has a cause of action to recover for the detriment he has thereby suffered.' [Citation.] Thus, if there is a 'misappropriation of trade secrets as a concomitant of the solicitation,' [citation], relief would be granted."

Here there is sufficient evidence establishing that ReadyLink is likely to prevail on its trade secret misappropriation claims. The evidence supports a reasonable finding that at the time of the preliminary injunction hearing there existed a threat that Cotton would use misappropriated trade secret information to solicit ReadyLink's employees and customers who had contracts with ReadyLink. The holding in *Courtesy Temporary Service, Inc. v. Camacho* (1990) 222 Cal.App.3d 1278 [272 Cal.Rptr. 352], a factually similar case, supports this conclusion.

In *Courtesy*, the plaintiff, a temporary employment agency, provided various companies with temporary workers. The defendants, former employees of the agency, admitted scheming to form a competitive business and compiled a list of the agency's major customers while employed by the agency. The agency sued the defendants for unfair trade practices and injunctive relief for setting up a competing agency. The trial court issued a preliminary injunction enjoining the former employees from soliciting the agency's customers and temporary labor force. The trial court also found, however, that the agency's customer list and related information was unprotected work product, and thus denied an injunction enjoining use and disclosure of the information.

The *Courtesy* court reversed the trial court ruling denying the injunction, concluding the customer list was a protectable trade secret under the UTSA and unfair competition statutes. In reaching this conclusion, the *Courtesy* court noted that the UTSA and case law "establish that a customer list procured by substantial time, effort, and expense is a protectable trade secret." (*Courtesy Temporary Service, Inc. v. Camacho, supra,* 222

Cal.App.3d at p. 1287.) Such a list is a protectable trade secret even if the list contains information available to the public or competitors: "[E]ven if the customers' names could be found in telephone or trade directories, such public sources ' "would not disclose the persons who ultimately made up the list of plaintiff's customers." ' [Citation.] It is the list of persons who actually purchase Courtesy's services that constitute confidential information." (*Courtesy, supra,* at p. 1288.)

The *Courtesy* court thus concluded that "Here, the evidence established that Courtesy's customer list and related information was the product of a substantial amount of time, expense and effort on the part of Courtesy. Moreover, the nature and character of the subject customer information, i.e., billing rates, key contacts, specialized requirements and markup rates, is sophisticated information and irrefutably of commercial value and not readily ascertainable to other competitors. Thus, Courtesy's customer list and related proprietary information satisfy the first prong of the definition of 'trade secret' under section 3426.1." (*Courtesy Temporary Service, Inc. v. Camacho, supra,* 222 Cal.App.3d at p. 1288.)

Likewise, here, some of the enjoined information might have been available to the public and/or to ReadyLink's competitors but there is substantial evidence establishing that ReadyLink's lists of hospitals and nurses, as well as other proprietary and confidential information listed in the preliminary injunction, were procured by substantial time, effort, and expense.

Considering the admitted misappropriation of sophisticated, detailed customer information and active solicitation by Cotton in the instant case, the trial court's granting ReadyLink injunctive relief was not an abuse of discretion. (*Courtesy Temporary Service, Inc. v. Camacho, supra,* 222 Cal.App.3d at pp. 1290–1291.) In *Courtesy,* the court also found that the trial court should have granted a preliminary injunction under the unfair competition provisions, Business and Professions Code section 17200 et seq. (*Courtesy, supra,* at p. 1291.) The court concluded that, "even if Courtesy's customer list would not qualify as a 'trade secret' under section 3426.1, the unfair and deceptive practices of employees in stealing Courtesy's customers should have been enjoined under Business and Professions Code section 17200 et seq." (*Ibid.*)

 In discussing unfair competition, the court in *Courtesy* explained that a former employee has the right to compete with his former employer, even for the business of those who had formerly been the customers of his former employer, provided such competition is fairly and legally conducted

and so long as it does not constitute unfair competition: "[A] former employee's use of confidential information obtained from his former employer to compete with him and to solicit the business of his former employer's customers, is regarded as unfair competition. [Citation.]" (*Courtesy Temporary Service, Inc. v. Camacho, supra,* 222 Cal.App.3d at p. 1292.)

In the instant case, there is ample evidence supporting the trial court's finding that Cotton misappropriated trade secret information and committed acts of unfair competition such that it is reasonably likely ReadyLink will prevail on its misappropriation claims and that denying a preliminary injunction will likely cause irreparable harm to ReadyLink.

(2) *Business and Professions Code Section 16607*

Cotton argues that ReadyLink cannot prevail because Business and Professions Code section 16607 only permits the restriction of information acquired within the last six months of employment and only for one year after employment termination. That provision states: "(a) Except as provided in subdivision (b), the *customer list, including the names, addresses* and identity of all employer customers who have listed job orders with an employment agency within a period of 180 days prior to the separation of an employee from the agency and including the names, addresses and identity of all applicant customers of the employment agency, *shall constitute a trade secret* and confidential information of, and shall belong to, the employment agency.

"(b) Notwithstanding the provisions of subdivision (a), no liability shall attach to, and no cause of action shall arise from, the *use of a customer list* of an employment agency by a former employee who enters into business as an employment agency *more than one year immediately following termination of his employment.*" (Italics added.)

▬ Business and Professions Code section 16607 does not bar the instant injunction because the injunction is premised not only on misappropriation of ReadyLink customer lists, but also on misappropriation of numerous other trade secret items. There is no time limitation on the duration of injunctive relief as to use of the other trade secret information. In *John F. Matull & Associates, Inc. v. Cloutier* (1987) 194 Cal.App.3d 1049 [240 Cal.Rptr. 211], the court upheld a covenant not to compete for five years after the defendant, who had been an employee and officer of the plaintiff firm, left the firm. The court concluded the covenant did not violate Business and Professions Code section 16600 to the extent it sought to prevent use of the firm's confidential information to compete and solicit the firm's labor-relations clients. ▬ Business and Professions Code section 16600

prohibits contracts restraining employees from engaging in a lawful profession. Misappropriation of trade secret information constitutes an exception to section 16600.

 While we need not consider ReadyLink's contract claim since there is sufficient evidence ReadyLink will prevail on its trade secret misappropriation claims, we note that "if a former employee uses a former employer's trade secrets or otherwise commits unfair competition, California courts recognize a judicially created exception to section 16600 and will enforce a restrictive covenant in such a case." (*Scott v. Snelling and Snelling, Inc.* (1990) 732 F.Supp. 1034, 1043, citing *Hollingsworth Solderless Terminal Co. v. Turley, supra,* 622 F.2d at p. 1338.; see also *D'Sa v. Playhut, Inc.* (2000) 85 Cal.App.4th 927, 934 [102 Cal.Rptr.2d 495]; *Trans-American Collections, Inc. v. Continental Account Servicing House, Inc.* (1972) 342 F.Supp. 1303 [This section does not apply to a covenant not to compete if the covenant is necessary to protect trade secrets, including customer lists].) Furthermore, injunctive relief is proper under the tort of misappropriation of trade secrets even without an enforceable confidentiality or nondisclosure agreement. (*Klamath-Orleans Lumber, Inc. v. Miller* (1978) 87 Cal.App.3d 458, 465–466 [151 Cal.Rptr. 118].)

Regardless of the legality of ReadyLink's noncompetition and nondisclosure agreements Cotton signed while working at ReadyLink, there is sufficient evidence supporting the trial court's finding that ReadyLink was likely to prevail on its misappropriation of trade secrets claims and thus injunctive relief was appropriate.

## C. *Irreparable Harm*

Cotton complains that the trial court failed to weigh his competing interests against those of ReadyLink and did not consider the irreparable harm he would suffer from the injunction. Cotton claims ReadyLink failed to show that it would suffer any irreparable harm in the absence of the preliminary injunction.

Cotton argues that at the time of the injunction hearing, he was no longer a threat because he was working as a real estate agent and no longer working in the healthcare staffing business. There was thus no evidence of any threat of imminent harm. The supporting declarations, Cotton argues, do not describe any conduct occurring at or about the time ReadyLink applied for the preliminary injunction in January 2003. The police searched his home and

computer in February 2002; he was fired in March 2002 for misappropriating proprietary information; he stopped working at ReadyLink's competitor, Registry Network, the end of April 2002, and has not worked in the healthcare staffing business since then. Cotton claims there is no evidence that since then he has been involved in any activity showing that he poses a threat to ReadyLink.

We find no merit to this argument, particularly since Cotton admitted stealing ReadyLink proprietary and confidential information and, after signing an admission, proceeded to use the stolen information for his own financial gain and to assist a ReadyLink competitor in taking away business from ReadyLink. If it is true that Cotton is not a threat because he is not working in the healthcare staffing business, then the preliminary injunction should have no impact on him. If this is not true and he intends to return to the healthcare staffing business, then he poses a significant threat to ReadyLink's business, and the preliminary injunction is appropriate.

The court may grant a preliminary injunction when there is evidence of the threat of committing an act in violation of the rights of another party respecting the subject of the action. (*Dodge, Warren & Peters Ins. Services, Inc. v. Riley* (2003) 105 Cal.App.4th 1414, 1418 [130 Cal.Rptr.2d 385].) The supporting declarations provide ample evidence that Cotton posed a threat to ReadyLink's business operations at the time of the injunction hearing. There was evidence he intended to create his own competing business and had taken significant steps to carry out his business plan, even though he had agreed not to commit such illicit acts. Cotton was caught on video stealing ReadyLink documents shortly before ReadyLink fired him. A search of his home and computer revealed he had misappropriated ReadyLink documentation and information. He acknowledged misappropriating proprietary and confidential information and agreed not to use or disclose the information. Nevertheless he did so and proceeded to solicit ReadyLink employees and nurses using the information. Right after leaving ReadyLink, Cotton secured a job at a ReadyLink competitor and continued soliciting ReadyLink employees and customers using the stolen ReadyLink proprietary information, while simultaneously pursuing his plan of creating his own healthcare staffing business. It thus could be reasonably concluded that, even though Cotton was working as a real estate agent at the time of the injunction hearing, there remained the threat he might attempt to solicit ReadyLink employees and steal ReadyLink nurses in furtherance of creating his own healthcare staffing business or assisting a ReadyLink competitor. He had attempted to do so in the past, despite knowing such conduct was wrong and agreeing not to do so.

Cotton argues the evidence established he was no longer a threat because the police seized all the misappropriated documentation, as well as his computer. But there is evidence that only a small portion of the misappropriated information and documentation was recovered. According to Watts's declaration, there remain unrecovered a large number of documents and it can be reasonably inferred that Cotton still has access to them. In fact, Watts concluded most of the documents were not recovered, including documents containing information used to contact ReadyLink nurses, the nurses' salary information, information regarding ReadyLink's per diem plan, and nurses' applications. According to Watts, this information was not generally available to the public or ReadyLink's competitors and ReadyLink had invested a great deal of time and expense in acquiring this information.

Kenneth Wheeler, Registry Network's Director of Education, stated in his declaration that he had observed defendant in possession of five large boxes full of ReadyLink documents, which included lists of nurses, completed nurse applications, tests, and forms. Cotton was using these documents while employed at Registry Network to recruit and place nurses. Cotton was also involved in developing for Registry Network a "Per Diem" pay plan to enhance Registry Network's ability to compete with ReadyLink.

Brenda Jacobs, a ReadyLink agent, stated in her declaration that Cotton told her in January 2002[3] he was starting a new nurse staffing company in competition with ReadyLink and he was taking 20 ReadyLink workers with him. He claimed he had investors for his company. He offered her and her husband salaried positions at his new company and said he planned to stay at ReadyLink "for a while longer because he wanted to 'stick it to ReadyLink' before he left." In Cotton's work station, there were several large boxes of nurse applications and other ReadyLink documents which he took home.

Elizabeth Madore, a ReadyLink nurse recruiter, stated in her declaration that during the fall of 2001, Cotton had told her he was going to start a new nurse staffing company and solicited her to work for him. Shortly after he left ReadyLink, he called her and asked her if she would leave ReadyLink and work as a nurse recruiter at Registry Network. He also asked her to assist him in getting other recruiters. Madore declined his solicitation. On one occasion she asked Cotton what would happen if ReadyLink came after them if she assisted him in recruiting nurses. He replied that ReadyLink had already come after him and had been unsuccessful, and his home had already been searched so ReadyLink could not search his home again.

---

[3] Jacobs's declaration states "January 2001" but it appears the year was 2002, since Jacobs states she became acquainted with Cotton in the fall of 2001.

Angela Rivera, a ReadyLink registry staffer, stated in her declaration that, while Cotton was still working at ReadyLink in 2002, she helped Cotton recruit nurses. When she discovered this was not being done for ReadyLink but for Cotton personally, he told her he was starting a new nurse staffing business to compete with ReadyLink. He said he was angry at Watts and ReadyLink because they had not treated him well. Two weeks after Cotton was terminated, he solicited Rivera to work for his new employer, Registry Network. Rivera met with Cotton a few days later and Cotton told her he had already placed 16 ReadyLink nurses at Registry Network and had offered Mangrello and Olayemi Olatunji of ReadyLink jobs at Registry Network. He also told her ReadyLink worker Carlos Tobin had been hired at Registry Network.

In addition to the supporting declarations, ReadyLink submitted Cotton's business plan for forming his new nurse staffing company and a statement, in letter form, dated April 4, 2002, by Olayemi Olatunji, stating that Cotton had called and offered her a position at Registry Network. He said Registry Network would pay her more than ReadyLink and would pay her per diem. Olatunji accepted Cotton's offer to work at a hospital as a Registry Network nurse.

Cotton's business plan consists of a formal document entitled "Confidential Private Placement Memorandum," dated February 2, 2001, which consists of an offer to sell investors 375,000 shares of preferred stock in Cotton's corporation, Planet Healthcare, a Delaware corporation. The document further states the corporation was incorporated on February 1, 2001, and its objective is to generate income through providing nurse staffing to acute care facilities.

This evidence establishes Cotton had the ability and the intent to start up a competing nursing staff business using protectable trade secret information stolen from ReadyLink. The evidence further indicates Cotton has a great deal of animosity toward ReadyLink and intended to achieve retribution, as well as financial gain, by stealing ReadyLink's business and employees. Cotton thus remained a viable threat to ReadyLink's business at the time of the January 2003 hearing.

D. *Injunction Language*

Cotton complains that the preliminary injunction language is vague, ambiguous, and overbroad. As explained above, we address only paragraph "a" of the injunction due to Cotton limiting his appeal in the notice of appeal to paragraph "a."

Cotton complains the injunction prohibits him from working in the nurse staffing business indefinitely, prevents him from using nonprotected information, and fails to specify in paragraph "a" who can and cannot solicit. The effect, he claims, is that he is barred from engaging in any nurse staffing business that competes with ReadyLink. Cotton asserts that the injunction must name the employees, agents, nurses, remote recruiters, hospitals, healthcare facilities and healthcare professionals he is prohibited from soliciting. Cotton's contentions lack merit.

Providing a list of all of ReadyLink's employees and customers in the preliminary injunction would result in disclosure of proprietary and confidential information highly beneficial to any competitor, including Cotton. Rather, if Cotton engages in the nurse staffing business during the pendency of this action and is uncertain as to whether he is enjoined from soliciting a particular individual or entity, he may simply inquire as to whether such individual or entity is under contract with ReadyLink.

We do agree, however, that the following injunction language in paragraph "a" is vague, ambiguous, and overbroad, and thus should be stricken from the injunction: (1) "or anyone," (2) "or associated with READYLINK HEALTH-CARE," and (3) "and any other healthcare facility or healthcare professional in a business relationship with READYLINK HEALTHCARE." Paragraph "a" in all other regards is sufficiently clear to enable Cotton to identify and understand those acts which he is enjoined from committing.

Also, contrary to Cotton's claim that the injunction is defective because it does not contain an expiration date, the preliminary injunction does not continue indefinitely. It clearly states it expires upon final resolution of this case.

## 4. Disposition

The preliminary injunction order is affirmed, subject to the modifications to paragraph "a" specified in this opinion. Accordingly, on remand, the trial court is directed to modify the preliminary injunction to state the following: Cotton shall "a. Cease and desist and refrain from engaging in any solicitation of READYLINK HEALTHCARE employees, agents, nurses, remote recruiters, hospitals, or any other healthcare facility or healthcare professional defendant JEROME COTTON knows or should know is under contract with READYLINK HEALTHCARE in regard to the nurse staffing business." As

modified, the preliminary injunction order and judgment are affirmed. The parties shall bear their own costs on appeal.

McKinster, Acting P. J., and Ward, J., concurred.